## PULLMAN'S PALACE CAR COMPANY *v.* MISSOURI PACIFIC RAILWAY COMPANY & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

Argued November 6, 9, 1885.—Decided December 7, 1885.

The consolidation of two or more railroad companies in Missouri, under authority derived from Rev. Stat. Missouri 1879, § 789, works a dissolution of the old corporations and the creation of a new corporation to take their place, subject to the then existing obligations of the old companies.

An agreement made by one of such companies before the consolidation, to be carried out over its entire line of railway, and on all roads which it then controlled or might thereafter control by ownership, lease, or otherwise, does not affect roads not so owned, leased or acquired at the time of the consolidation, but acquired by the new company subsequently to it.

An agreement by a railway company to haul cars over all roads which it controls or may control by ownership, lease or otherwise, does not oblige it to haul cars over the connecting road of another company in whose stock it acquires, subsequently to the agreement, a controlling interest, if the other company maintains its corporate organization, and its directors retain the control of its road.

This was a suit in equity brought by Pullman's Palace Car Company to enjoin the Missouri Pacific Railway Company and the St. Louis, Iron Mountain and Southern Railway Company from discontinuing the use of the drawing-room cars and sleeping cars of the Pullman Company on the line of the St. Louis, Iron Mountain and Southern Company; from refusing to haul such cars on passenger trains running on such line; and from contracting with any other person for supplying like cars for that use. The court below dismissed the bill on demurrer, and from a decree to that effect this appeal was taken.

The case made by the bill was in substance this:

On the 8th of March, 1877, the Missouri Pacific Railway Company was a Missouri corporation owning and operating a railroad between St. Louis and Kansas City, and Pullman's Palace Car Company, an Illinois corporation, engaged in the business of manufacturing drawing-room cars and sleeping cars, and hiring them to, or otherwise arranging with, railway

companies for their use upon railroads under written contracts for a term of years. By a written contract entered into on that day the Pullman Company agreed to furnish the Missouri Pacific Company, for fifteen years, upon certain specified terms, with drawing-room and sleeping cars sufficient to meet all the requirements of travel, and the Missouri Pacific Company agreed " to haul the same on the passenger trains on its own line of road, and on all roads which it now controls, or may hereafter control, by ownership, lease, or otherwise." The railway company also agreed that the Pullman Company " shall have the exclusive right, for a term of fifteen years from the date, . . . to furnish for the use of the railway company drawing-room or parlor and sleeping cars on all the passenger trains of the railway company, and over its entire line of railway, and on all roads which it controls, or may hereafter control, by ownership, lease, or otherwise, . . . and that it will not contract with any other party to run said class of cars on and over said lines of road during said period of fifteen years."

Some time during the summer or autumn of 1880, and as early as October 7th, the Missouri Pacific Company " consolidated with itself certain other companies, under the laws of Missouri, retaining its former name; and . . . said consolidated company assumed all the obligations of the separate consolidating companies, and continued to use and operate the former road, together with other consolidated lines."

The St. Louis, Iron Mountain and Southern Railway Company was, and for many years had been, a corporation owning and operating a railroad from St. Louis, in a southwesterly direction, to Texarkana. On the 20th of November, 1871, that company entered into a contract with the Pullman Company, similar to the one with the Missouri Pacific Company, for the hauling of the Pullman cars on its line until November 20, 1881.

In or about the month of December, 1880, the Missouri Pacific Company " acquired and became the owner of more than a majority of the stock of said St. Louis, Iron Mountain and Southern Railway Company," and this, as the bill alleges,

was done " with the intent and purpose of controlling the management and administration of the said St. Louis, Iron Mountain and Southern Railway Company, and for the purpose of subordinating, in effect, the said St. Louis, Iron Mountain and Southern Railway Company and the Missouri Pacific Railway Company to the same management and control, and of running and operating said roads as one line, and in the interest of the Missouri Pacific Railway Company."

Since that time the Missouri Pacific Company had acquired all but about 1195 of the 220,682 shares of the capital stock of the St. Louis, Iron Mountain and Southern Company. Five of the directors of the Missouri Pacific were also directors in the St. Louis, Iron Mountain and Southern Company, and the two roads were operated under the same general management. The general offices of the two companies were kept together, and both roads were managed substantially by the same persons. All this was brought about and done, as was alleged, in pursuance of an arrangement between the Missouri Pacific Company and persons who were at the time the holders of nearly all the stock of the St. Louis, Iron Mountain and Southern Company " for the transfer of the ownership and control of the franchises, property, and business of said last-named corporation to the said Missouri Pacific Railway Company," it being part of the arrangement that the " stockholders of the said St. Louis, Iron Mountain and Southern Railway Company should not divest themselves altogether of their interest in the franchises, property, and business thereof, but that they should place the same under the control and management of the said Missouri Pacific Railway Company, by the method of the transfer of their stock in said St. Louis, Iron Mountain and Southern Railway Company to the said Missouri Pacific Railway Company, and retain their interest therein by receiving in exchange therefor the stock of the said Missouri Pacific Railway Company, in the proportion of three shares of the stock of the Missouri Pacific to four shares of said St. Louis, Iron Mountain and Southern ; and it was understood that, as a part of said arrangement, the stock of said Missouri Pacific Railway Company received in exchange for said stock of said St. Louis, Iron

Mountain and Southern would represent in the hands of its holders a combined interest in the properties of both of said corporations; and that the stock of said St. Louis, Iron Mountain and Southern which was by the arrangement aforesaid acquired by the said Missouri Pacific Railway Company should be retained, held, and used by it to control the franchises, property, and business of the said St. Louis, Iron Mountain and Southern Railway Company, in pursuance and execution of the purpose aforesaid, through the authority of the board of directors of said Missouri Pacific Railway Company, and in the interest of all persons so holding as aforesaid stock of the Missouri Pacific Railway Company."

And this, it was further alleged, was done in pursuance " of a general purpose to place the affairs aforesaid of said St. Louis, Iron Mountain and Southern Railway Company under the control of the said Missouri Pacific Railway Company, that they might be operated together as one institution as nearly as possible, and was a mode adopted to that end in lieu of various other methods and modes proposed and considered, namely, by consolidation, by lease, and otherwise, as being least subject to objection, based upon considerations of policy or legality."

At the expiration of the contract between the Pullman Company and the St. Louis, Iron Mountain and Southern Company, the president of the last-named company notified the Pullman Company that the further right of that company to have its cars hauled over the line of the St. Louis, Iron Mountain and Southern road was denied, and that the railroad company would cease to operate its road with the cars of the Pullman Company.

As a ground of equitable relief, the bill contained the following allegations :

" Your orator further shows that the refusal to operate your orator's cars upon the St. Louis, Iron Mountain and Southern Railway, and the denial of your orator's right as aforesaid, is a plain and palpable violation of the provisions of the contract between your orator and said Missouri Pacific Railway Company ; that such contract cannot be violated without the great-

est and most irreparable damage to your orator; that the cars constructed for the operation of your orator's business are of a very costly sort; that your orator has invested a very large capital in the construction and operation of said cars; that the business of your orator, under its charter, and for which it is incorporated, is of such a nature that it can be transacted only through the instrumentality of contracts of the character herein set forth with railroad companies engaged in the business of running railway passenger trains; that by means of such contracts it can run through cars between remote points and over distances far greater than the length of the separate lines of road, to the great convenience of the public; and that the upholding and enforcement of such contracts is of vital importance and relation to the exercise of the corporate franchises of your orator, and to the public convenience; that if said contracts can be violated as is threatened in the matters hereinbefore stated, the facilities of through travel aforesaid will be broken up, and the property and estate of your orator, to the extent of very many thousands of dollars, which largely exists and inheres in such contracts, will be destroyed in value, and the corporate franchises of your orator practically destroyed; that by reason of the magnitude of the investment as aforesaid, and the cost of operating such cars, your orator cannot receive a fair return, unless it can have the exclusive operation of said business, as provided in said contracts, with the several companies over whose roads it operates, and that the exclusive right bargained for, and obtained by your orator in said contracts, as in the contract hereinbefore mentioned, is not only reasonable but absolutely necessary for the success of your orator's business, without which your orator could not make desirable contracts, and would not have made the agreement with the said Missouri Pacific Railway Company hereinbefore mentioned.

"Your orator further shows that in making the contract hereinbefore set forth with said railroad companies, and in making the provisions therein contained, for the extension of the operation of your orator's cars upon such roads as should come within their control, it has had in contemplation the

growth and development of the business which, in the performance of said contract for many years past, it has been building up and developing in the region of country through which the said lines of railway hereinbefore mentioned run; that said business has been largely built up and developed by the efforts and instrumentality of your orator; that, in the hope and prospect of its future development, your orator has borne the burden of sustaining and upholding it, when the business was comparatively small and unremunerative; and that it will be a gross injustice and inequity to permit said railroad companies, by violation of contract, as aforesaid, to remove at the present time the cars of your orator from the line of the said St. Louis, Iron Mountain and Southern Railway Company, or to discontinue operating them thereon, or to substitute the cars of any other party thereon."

*Mr. Edward S. Isham* for appellant.—The burden of this bill is that the road of the Iron Mountain Railway Company has by virtue of an executed agreement passed into the actual control of the Missouri Pacific Railway Company. The bill does not set out a written contract, and then aver its meaning by the construction of its terms. It avers a contract, whose terms are shown only by its averments; and in this respect none of the authorities cited by appellees apply. The substantial averments are (1.) An agreement to unite the Iron Mountain Road with that of the Missouri Pacific, under the common management of the Missouri Pacific Railway Company, as a part of one line with its own road. (2.) The massing of all or substantially all the stock of the Iron Mountain Road in the treasury of the Missouri Pacific, and a substitution by exchange of the stock of the Missouri Pacific therefor, as one step taken in carrying that agreement into effect. (3.) "The purpose on the part of both of said corporations of putting the control" of the property of the Iron Mountain into the hands of the said Missouri Pacific "and of subordinating in effect the roads of both the said corporations to one and the same management and control," namely, that of the Missouri Pacific. (4.) The consummation of that intent and purpose; in that im-

mediately upon the acquisition by the Missouri Pacific of the control of the affairs of the Iron Mountain Company, "and in the exercise of the control of said Missouri Pacific Railway Company, they proceeded to put the persons who were charged with the management of the affairs of the Missouri Pacific Railway Company, into the actual control and management of the franchises, property, business and road of the Iron Mountain Company." (5) The actual fact of the present control and management of the business and road of the Iron Mountain by the Missouri Pacific; that the general offices of the Iron Mountain have been everywhere abandoned and closed and their business has been transferred to the offices of the Missouri Pacific, and in every respect there has been effected and brought about a complete absorption of the said St. Louis, Iron Mountain and Southern Railway Company, and a complete amalgamation of the said two companies, so far as the actual conduct and administration of their business is concerned.

These averments (1) as to an agreement; (2) as to the intention of the parties; (3) as to the consummation of the agreement, are all questions of fact, not traversed, and are admitted by the demurrer. Intention is a traversable fact. *Moss* v. *Riddle*, 5 Cranch, 351, 357; *Thurston* v. *Cornell*, 38 N. Y. 281; *Haight* v. *Haight*, 19 N. Y. 464, 468; *Miller* v. *Miller*, 15 Barb. 203; *Forbes* v. *Waller*, 25 N. Y. 430, 439; *Clift* v. *White*, 12 N. Y. 519, 538; *De Ridder* v. *McKnight*, 13 Johns. 294; *Walker* v. *Sedgwick*, 8 Cal. 398. These averments, therefore, are matters of substantive fact. If the appellees were not to treat them as assumed to be true on demurrer, they ought to have traversed them. If they are true the Iron Mountain road is within the control of the Missouri Pacific.

*Mr. Isham* also argued that appellant's only remedy for the enforcement of those parts of the contract which were negative was by injunction, citing *Western Union Tel. Co.* v. *Union Pacific Railway Co.*, 1 McCrary, 418, 558, and 581; Pomeroy on Specific Performance, §§ 24, 25, 310, 311, 312; *Singer Co.* v. *Union Co.*, 1 Holmes, 253, 256; *Jones* v. *North*, L. R. 19 Eq. 426; *De Mattos* v. *Gibson*, 4 DeG. & J. 276, 279; *Vincent*

v. *Chicago & Alton Railroad Co.*, 49 Ill. 33; *Frank* v. *Brunnemann*, 8 W. Va. 462; *Rankin* v. *Huskisson*, 4 Sim. 13; *Cole Mining Co.* v. *Virginia &c. Water Co.*, 1 Sawyer, 470 and 685; *Memphis & Little Rock Railroad Co.* v. *Southern Express Co.*, 8 Fed. Rep. 799.

*Mr. John F. Dillon* and *Mr. A. T. Britton* for appellees.

Mr. CHIEF JUSTICE WAITE delivered the opinion of the court. After stating the facts in the language reported above, he continued:

The main questions involved in the merits of this case are, 1, whether the contract between the Missouri Pacific and Pullman Companies, made before the consolidation, binds the consolidated company to haul the Pullman cars over the road of the St. Louis, Iron Mountain and Southern Company, if that road is controlled by the consolidated company within the meaning of the contract; and, 2, whether it is so controlled by the consolidated company.

The present Missouri Pacific Company is a different corporation from that which contracted with the Pullman Company. The original company owned and operated a railroad between St. Louis and Kansas City. This company owns and operates that road and others besides. It is a new corporation created by the dissolution of several old ones, and the establishment of this in their place. It has new powers, new franchises, and new stockholders. *Clearwater* v. *Meredith*, 1 Wall. 25, 42; *Shields* v. *Ohio*, 95 U. S. 319, 323; *Railroad Co.* v. *Maine*, 96 U. S. 499, 508; *Railroad Co.* v. *Georgia*, 98 U. S. 359, 364; *Louisville & Nashville Railroad Co.* v. *Palmes*, 109 U. S. 244, 254. The bill does indeed aver that the Missouri Pacific Company "consolidated with itself certain other companies, . . . retaining its former name," but, as this was done under the laws of Missouri, the effect of the consolidation depends on those laws. *Central Railroad Co.* v. *Georgia*, 92 U. S. 665, 670. They provide that "any two or more railroad companies in this State, existing under either general or special laws, and owning railroads constructed wholly or in part, which, when

completed and connected, will form, in the whole or in the main, one continuous line of railroad, are hereby authorized to consolidate in the whole or in the main, and form one company owning and controlling such continuous line of road, with all the powers, rights, privileges and immunities, and subject to all the obligations and liabilities to the State, or otherwise, which belong to or rested upon either of the companies making such consolidation." In order to accomplish such consolidation an agreement to that effect must be entered into by the companies interested. "A certified copy of such articles of agreement, with the corporate name to be assumed by the new company, shall be filed with the secretary of state when the consolidation shall be considered duly consummated, and a certified copy from the office of the secretary of state shall be deemed conclusive evidence thereof." "The board of directors of the several companies may then proceed to carry out such contract according to its provisions, calling in the certificates of stock then outstanding in the several companies or roads, and issuing certificates of stock in the new consolidated company under such corporate name as may have been adopted." Rev. Stat. Missouri 1879, § 789. This clearly contemplates the actual dissolution of the old corporations and the creation of a new one to take their place.

The new company assumed on the consolidation all the obligations of the old Missouri Pacific. This requires it to haul the Pullman cars, under the contract, on all roads owned or controlled by the old company at the time of the consolidation, but it does not extend the operation of the contract to other roads which the new company may afterwards acquire. The power of the old company to get the control of other roads ceased when its corporate existence came to an end, and the new company into which its capital stock was merged by the consolidation undertook only to assume its obligations as they then stood. It did not bind itself to run the cars of the Pullman Company on all the roads it might from time to time itself control, but only on such as were controlled by the old Missouri Pacific. Contracts thereafter made to get the control of other roads would be the contracts of the new consolidated

company, and not of those on the dissolution of which that company came into existence. It follows that the present Missouri Pacific Company is not required, by the contract of the old company, to haul the Pullman cars on the road of the St. Louis, Iron Mountain and Southern Company, even if it does now control that road, within the meaning of the contract.

We are also of opinion that the railroad of the St. Louis, Iron Mountain and Southern Company is not controlled by the present Missouri Pacific Company in such a way as to require that company to haul the Pullman cars over it, if the contract is binding on the new company to the same extent it would be on the old were that company still in existence and standing in the place of the new. Confessedly the St. Louis, Iron Mountain and Southern Company keeps up its own corporate organization. It operates its own road. It has its own officers and makes its own bargains. The Missouri Pacific owns all, or nearly all, its stock, and in that way can determine who shall constitute its board of directors, but there the power of that company over the management stops. The board when elected has controlling authority, and for its doings is not necessarily answerable to the Missouri Pacific Company. The two roads are substantially owned by the same persons and operated in the same interest, but that of the St. Louis, Iron Mountain and Southern Company is in no legal sense controlled by the Missouri Pacific.

It is true the bill avers in many places and in many ways that the purchase of the stock of the St. Louis, Iron Mountain and Southern Company was made by the Missouri Pacific Company for the purpose and with the intent of getting the control of the road of the St. Louis, Iron Mountain and Southern, and that the case is before us on demurrer to the bill. A demurrer admits all facts stated in the bill which are well pleaded, but not necessarily all statements of conclusions of law. What was actually done is stated clearly and distinctly. The effect of what was done is a question of law, not of fact. It is a matter of no importance what the purpose of the parties was if what they did was not sufficient in law to accomplish what they wanted. When there is doubt, the purpose and intention

of the parties may sometimes aid in explaining what was done, but here there is no need of explanation. The Missouri Pacific Company has bought the stock of the St. Louis, Iron Mountain and Southern Company, and has effected a satisfactory election of directors, but this is all. It has all the advantages of a control of the road, but that is not in law the control itself. Practically it may control the company, but the company alone controls its road. In a sense, the stockholders of a corporation own its property, but they are not the managers of its business or in the immediate control of its affairs. Ordinari.y they elect the governing body of the corporation, and that body controls its property. Such is the case here. The Missouri Pacific Company owns enough of the stock of the St. Louis, Iron Mountain and Southern to control the election of directors, and this it has done. The directors now control the road through their own agents and executive officers, and these agents and officers are in no way under the direction of the Missouri Pacific Company. If they or the directors act contrary to the wishes of the Missouri Pacific Company, that company has no power to prevent it, except by the election, at the proper time and in the proper way, of other directors, or by some judicial proceeding for the protection of its interest as a stockholder. Its rights and its powers are those of a stockholder only. It is not the corporation, in the sense of that term as applied to the management of the corporate business or the control of the corporate property.

Something was intimated in argument about the duty of the railway company to haul the cars of the Pullman Company, because of the nature of the business in which the latter company was engaged, which consisted " of hiring or otherwise arranging with railway companies to use its cars," " under written contracts, for a term of years." The bill also alleges that, " by reason of the magnitude of the investment " " and the cost of operating such cars," the Pullman Company " cannot receive a fair return unless it can have the exclusive operation of said business, as provided in said contracts with the several companies over whose roads it operates." It may be, as is also alleged, that it has " become indispensable, in the conduct of

the business of a railroad company, to run on passenger trains sleeping and drawing-room cars, with the conveniences usually afforded by such cars for night travel," but it by no means follows that the railway is, in law, obliged to arrange with the Pullman Company for such accommodations. According to the bill itself, two such car companies cannot successfully carry on a competing business on the same road, and the custom has been for the Pullman Company, if possible, to contract for the exclusive right. The business is always done under special written contracts. These contracts must necessarily vary, according to the special circumstances of each particular case. Certainly, it cannot be claimed that a court of chancery is competent to require these companies to enter into such a contract for the furnishing and hauling of Pullman cars, as the court may deem reasonable. A mere statement of the proposition is sufficient to show that it is untenable.

An objection was raised to the jurisdiction of a court of equity to grant relief such as is asked. This we do not consider, as we are all agreed that the demurrer was properly sustained upon the other grounds.

*Decree affirmed.*