### UNITED STATES v. LEHIGH VALLEY R. CO.

(Circuit Court, E. D. Pennsylvania. March 7, 1910.)

#### No. 97.

Action by the United States against the Lehigh Valley Railroad Company. On motion to dismiss without prejudice. Denied, and defendant's motion to dismiss absolutely granted.

See, also, 162 Fed. 410, and 164 Fed. 215.

Edwin P. Grosvenor, Sp. Asst., and George W. Wickersham, Atty. Gen., for the United States.

J. F. Schapperkotter, Robert W. De Forrest, and John G. Johnson, for defendant.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

PER CURIAM. In considering this motion it must be remembered that the decree of the Supreme Court in the matter of the appeal from the decree of this court in the present case is in these words:

"It is now here ordered and adjudged that the judgment of the said Circuit Court in this cause be and the same is hereby reversed; and it is further ordered that this cause be and the same is hereby remanded to the said Circuit Court for further proceedings in conformity with the opinion of this court."

As we read that opinion, the Supreme Court has decided on the facts set forth in the bills and answers of the several cases before it that the holding by one of the defendant companies of the entire stock

of a bona fide corporation, and the control thereby resulting to it from its power, and the exercise thereof, to appoint its directors and manage its business, does not give such railroad company any interest, direct or indirect, in the coal which may be mined by such corporation and transported in interstate commerce over the lines of such railroad company within the meaning of these words as contained in the act under review. In the bill of complaint filed in this cause it is alleged:

"That the defendant [the Lehigh Valley Railroad Company] is, and has been continuously since long before the said 1st day of May, in the year 1908, the owner of the entire capital stock of the Lehigh Valley Coal Company and of Coxe Brothers & Company, Incorporated, corporations of the said state of Pennsylvania, and that it thus controls, and has been controlling, the election of the directors or managers of said coal companies. That said coal companies hold, by conveyances and leases made long before the said 1st day of May, in the year 1908, anthracite coal lands and coal mines situated and being in the counties of Carbon, Lehigh, Luzerne, and Wyoming, in the said state of Pennsylvania; but said coal lands and coal mines are, as they have been continuously since long before the said 1st day of May, in the year 1908, now being operated, in the mining of anthracite coal, by and under the direct management of the respective presidents and directors of said coal companies, the president of each of said coal companies being, as he has been for a long time past, the president of the defendant, and a majority of the directors of each of said coal companies being officers or directors of the defendant, as they have been for a long time past. That by virtue of the ownership of the entire capital stock of said companies by the defendant, as hereinbefore stated, the defendant owns said coal lands and coal mines, and the anthracite coal therein or thereupon, and mined and being mined, therefrom, * * * and that by virtue of the management of said coal companies by certain of the officers of the defendant, as hereinbefore stated, the operations of said coal companies in the mining of anthracite coal, have been, and are now being, carried on by and under the authority of the defendant."

The defendant, while denying the legal conclusion from the material facts thus alleged by the bill of complaint—

"* * * admits that it is now and has been for many years past the owner of shares of the capital stock of the coal companies named in the bill of complaint, and alleges in regard thereto as follows: This defendant now owns the entire capital stock of the Lehigh Valley Coal Company."

With these averments of the bill and the answer before it, and the cause having been heard on the pleadings, the Supreme Court in its opinion said:

"It remains to determine the nature and character of the interest embraced in the words 'in which it is interested directly or indirectly.' The contention of the government that the clause forbids a railroad company to transport any commodity manufactured, mined, or produced, or owned in whole or in part, etc., by a bona fide corporation in which the transporting carrier holds a stock interest, however small, is based upon the assumption that such prohibition is embraced in the words we are considering. The opposing contention, however, is that interest, direct or indirect, includes only commodities in which a carrier has a legal interest, and therefore does not exclude the right to carry commodities which have been manufactured, mined, produced, or owned by a separate and distinct corporation, simply because the transporting carrier may be interested in the producing, etc., corporation as an owner of stock therein. If the words in question are to be taken as embracing only a legal or equitable interest in the commodities to which they refer, they cannot be held to include commodities manufactured, mined, produced, or owned, etc., by a distinct corporation, merely because of a stock ownership of the carrier. Pullman Palace Car Co. v. Missouri Pacific R. R., 115 U. S. 587 [6 Sup. Ct.

194, 29 L. Ed. 499]; Conley v. Mathieson Alkali Works, 190 U. S. 406 [23 Sup. Ct. 728, 47 L. Ed. 1113]. And that this is well settled also in the law of Pennsylvania is not questioned. It is unnecessary to pursue the subject in more detail, since it is conceded in the argument for the government that if the clause embraces only a legal interest in an article or commodity it cannot be held to include a prohibition against carrying a commodity simply because it had been manufactured, mined, or produced, or is owned, by a corporation in which the carrier is a stockholder. The contention of the government substantially rests upon the assumption that unless the words be given the meaning contended for they are without significance. That this is clearly not the case is well illustrated by the New Haven Case, supra [200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515]. In that case the Chesapeake & Ohio Railway Company, it was shown, at one time not only directly engaged in buying, selling, and transporting coal, but subsequently, when a statute was passed in West Virginia prohibiting such dealings, it resorted to indirect methods for the continuance of its previous practice. It may well be that the very object of the provision was to reach and render impossible the successful employment of methods of the character referred to. Certain it is, however, that in the legislative progress of the clause in the Senate, where the clause originated, an amendment in specific terms, causing the clause to embrace stock ownership, was rejected, and immediately upon such rejection an amendment, expressly declaring that interest, direct or indirect, was intended, among other things, to embrace the prohibition of carrying a commodity manufactured, mined, produced, or owned by a corporation in which a railroad company was interested as a stockholder, was also rejected. 40 Cong. Rec. (1906) pt. 7, pp. 7012-7014. And the considerations just stated we think completely dispose of the contention that stock ownership must have been in the mind of Congress, and therefore must be treated as though embraced within the evil intended to be remedied, since it cannot in reason be assumed that there is a duty to extend the meaning of a statute beyond its legal sense upon the theory that a provision which was expressly excluded was intended to be included. If it be that the mind of Congress was fixed on the transportation by a carrier of any commodity produced by a corporation in which the carrier held stock, when we think the failure to provide for such a contingency in express language gives rise to the implication that it was not the purpose to include it, at all events, in view of the far-reaching consequences of giving the statute such a construction as that contended for, as indicated by the statement taken from the answers and returns which we have previously inserted in the margin, and of the questions of constitutional power which would arise if that construction was adopted, we hold the contention of the government not well founded. We then construe the statute as prohibiting a railroad company engaged in interstate commerce from transporting in such commerce articles or commodities under the following circumstances and conditions: * * * When the carrier at the time of transportation has an interest, direct or indirect, in a legal or equitable sense in the article or commodity, not including, therefore, articles or commodities manufactured, mined, produced, or owned, etc., by a bona fide corporation in which the railroad company is a stockholder."

The counsel for the complainant, after the reinstatement of the cause, applied to this court for leave to amend the bill of complaint. The court thought the application should be denied, and accordingly did deny it. Thereupon the counsel for the government moved to dismiss the bill of complaint without prejudice, which motion was opposed by counsel for the defendant. The court having declined to grant this motion, the counsel for the defendant thereupon moved to dismiss the bill absolutely. The court then inquired of counsel for the government whether, in view of the premises, it was desired to have the cause stand for further proceedings in this court, and upon the statement that the government would not proceed any further in this court in view of the fact that the amendment had been disallowed, our conclusion is that the bill should be dismissed absolutely

upon the allegations of the bill and answer. It will be observed that this case differs from United States v. Delaware, Lackawanna & Western Railroad Company, 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836, in which, upon its reinstatement, an injunction was ordered to be issued.