[No. 8934.    Department Two.    January 6, 1911.]

THE STATE OF WASHINGTON, *on the Relation of the City of Tacoma, Respondent,* v. TACOMA RAILWAY AND POWER COMPANY, *Appellant.*[1]

STREET RAILWAYS — FRANCHISES— TRANSFERS— CORPORATIONS — MERGER. A street railway company's franchise, which compelled the granting of transfers over all lines controlled by it, cannot be invoked to compel the granting of transfers over the line of a competing traction company (also required to give transfers to any other line giving transfers to it) a majority of the capital stock of which had been acquired by a corporation owning the capital stock of the street railway company, although through such control or merger the officers of the street railway were elected officers of the traction company and managed its affairs, the latter's shops and offices were closed, and physical connection was made between the lines; since each corporation continued to exist as distinct entities having contract rights, regardless of the majority holding of their capital stock (DUNBAR, J., dissenting).

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered February 17, 1910, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, awarding a writ of mandamus to compel a universal transfer system on all the street railway lines in a city. Reversed.

*B. S. Grosscup* and *W. C. Morrow,* for appellant.

*T. L. Stiles* and *F. R. Baker,* for respondent.

CHADWICK, J.—The Tacoma Railway & Power Company having, prior to April 1, 1903, acquired a number of separate franchises and detached pieces of street railroads in the city of Tacoma, upon which separate fares had been charged and only a partial transfer system inaugurated, entered into a contract with the city, which was designed to settle existing disputes and differences, provide a single fare over all lines controlled by the railway, and to establish a transfer system

[1] Reported in 112 Pac. 506.

covering all the lines controlled by it.    Thereafter, by Ordinance No. 1,809, a franchise was granted to the Pacific Traction Company to build and operate a line of street railway in the city of Tacoma.    Section 12 of the Ordinance is, in part, as follows:

"And the payment of a fare shall entitle the passenger to a transfer to any other line within the city of Tacoma which may give and receive transfers to and from the lines operated under this franchise, and the presentation of a transfer from any other lines which may give and receive transfers shall entitle the holder thereof to passage on the cars operated under this franchise to any point within the city limits."

The railway company had at all times a line in operation upon Pacific avenue, thence up Ninth street to C street.    This line was known as the "Old Town" line.    Several of its lines ran up and down C street, so that the intersection of Ninth and C streets was a sort of common center for passenger traffic.    The city terminus of the traction company's line was on Commerce street, a street lying between Pacific avenue and C street.    The traction company was owned and controlled as an opposition company, each line running to, and serving the population residing in, what is known as "South Tacoma." The traction line crossed the railway line at several places, but there was no physical connection between the roads.    Nor did the one transfer passengers to the other.    Each maintained different officers and employees, and each owned and operated shops and terminals where cars were kept and repaired.    A majority of the stock of the railway company is owned by the Puget Sound Electric Railway.

In the summer of 1909, the Puget Sound Electric Railway acquired a majority of the stock of the traction company, since which time, as it is said, for convenience and economy of administration, and for the mutual benefit of both roads, and especially for the advantage of the traction company, a physical connection between the two lines has been made at the intersection of C and Commerce streets, and also at Fifty-

fourth street.  Freight is transferred from one line to the other.  The cars of one line, to some extent at least, have been used on the other line.  The offices of the traction company have been closed, and all its office work has been put upon the officers and employees of the railway company.  The shops of the traction company have been closed and its machinery dismantled, the repairing being all done at the shops of the railway company.  The testimony shows, that the accounts and books of the two companies are separately kept; that the freight earnings on transferred freight are apportioned between the two companies by a traffic manager, who acts in the same capacity for both lines; that all repairing chargeable to the traction line is done at actual cost by the railway company, with ten per cent added.

Since the Puget Sound Electric Railway acquired control of the stock of the traction company, that company and the railway company have been managed by the same person, and the same person has been superintendent of both companies. The manager of the railway and of the traction company is not paid by either of them, but by a concern known as the Stone-Webster Company.  It is pertinent to add that the railway company is a New Jersey corporation, having at the time of the trial the following officers and board of directors: President, Russell Robb; 1st Vice President, Guy E. Tripp; Treasurer, Henry B. Sawyer; Secretary, Alvah K. Todd; Directors: T. Nelson Perkins, John S. Bartlett, Henry B. Sawyer, Chandler Hovey, Russell Robb, A. S. Michener, John R. Turner, Sidney Z. Mitchell, and Guy E. Tripp. The traction company is a Maine corporation, with the following officers and board of directors: President, Guy E. Tripp; 1st Vice President, Fred S. Pratt; Treasurer, Henry B. Sawyer; Secretary, Alvah K. Todd; Directors: A. S. Michener, E. Howard George, Fred S. Pratt, Alvah K. Todd, and Guy E. Tripp.

It is not shown, nor is any attempt made to show, that the appellant railway company owns any stock in the traction

company, or in any way directs and controls its policy. Nor is the traction company or the Puget Sound Electric Railway, the owner of a majority of the stock of both the local companies, made parties to the suit; the relator's whole claim being that the appellant should bring the traction company within the terms of its settlement agreement with the city, and issue transfers "because every external circumstance pointed toward the conclusion that it was at least operating the traction line of street railway, if it did not in fact own and control it." The following clause of the contract is relied on:

"Fifth: On and after the first day of April, 1903, the said party of the first part [the railway Co.] shall transport any person from any point or place within the corporate limits of the city of Tacoma, on any lines of street railway owned, operated or controlled by said party of the first part to the terminus of its line in Point Defiance Park for a single fare not exceeding five cents, and the party of the first part agrees that it will from and after the date of this agreement extend its present transfer system for a continuous trip one way to and from all lines within the city of Tacoma (and including that portion of the Point Defiance line outside of the city of Tacoma), but nothing in this section shall be so construed as to require the issuance of transfers which can be so used on parallel or other lines as to make possible for a passenger to make a round trip for one fare, nor to prevent the party of the first part from making and enforcing all reasonable rules and regulations necessary, in its judgment, to prevent fraud."

We would be glad to hold with the relator, for nothing can work greater hardship and inconvenience to the public than two lines of street railway, operating in the same community but denying the right of transfer. But the legal effect of such ruling would be to make a judicial decree consolidating two companies which under their franchises were designed to be competing lines, a result generally held to be void on the ground of public policy, or to work a dissolution of the corporate franchise. Not only would the majority stockholders of the traction company have a right to be heard, but the minority stockholder must have his day in court as well. The

right of transfer from one system to another is a matter of contract or right reserved in the franchise, and there is nothing in the railway company's franchise that would compel it to transfer passengers to another if it be independent in law. The remedy is legislative and not judicial.

The decisions of the supreme court of the United States and other authorities which we shall cite, sustain appellant in the legal position it has assumed. In *Pullman's Palace Car Co. v. Missouri Pac. R. Co.*, 115 U. S. 587, the Pullman company sought to compel the Missouri Pacific Railway Company to haul its cars over certain lines owned, operated or controlled by lease, the fact further appearing that the Missouri Pacific owned a majority of the stock of the other lines. The supreme court of the United States held that the contract of the Pullman company was inoperative, except on the line originally contracted with, the court saying:

"The Missouri Pacific Company has bought the stock of the St. Louis, Iron Mountain and Southern Company, and has effected a satisfactory election of directors, but this is all. It has all the advantages of a control of the road, but that is not in law the control itself. Practically it may control the company, but the company alone controls its road. In a sense, the stockholders of a corporation own its property, but they are not the managers of its business or in the immediate control of its affairs. Ordinarily they elect the governing body of the corporation, and that body controls its property. Such is the case here. The Missouri Pacific Company owns enough of the stock of the St. Louis, Iron Mountain and Southern to control the election of directors, and this it has done. The directors now control the road through their own agents and executive officers, and these agents and officers are in no way under the direction of the Missouri Pacific Company. If they or the directors act contrary to the wishes of the Missouri Pacific Company, that company has no power to prevent it, except by the election, at the proper time and in the proper way, of other directors, or by some judicial proceeding for the protection of its interest as a stockholder. Its rights and its powers are those of a stockholder only. It is not the corporation, in the sense of that term as applied to the management of

the corporate business or the control of the corporate property."

In *Button v. Hoffman*, 61 Wis. 20, 20 N. W. 667, 50 Am. Rep. 131, it was said:

"From the very nature of a private business corporation, or, indeed, of any corporation, the stockholders are not the private and joint owners of its property. The corporation is the real, though artificial person substituted for the natural persons who procured its creation and have pecuniary interests in it, in which all its property is vested, and by which it is controlled, managed, and disposed of. It must purchase, hold, grant, sell, and convey the corporate property, and do business, sue and be sued, plead and be impleaded, for corporate purposes, by its corporate name. The corporation must do its business in a certain way, and by its regularly appointed officers and agents, whose acts are those of the corporation only as they are within the powers and purposes of the corporation. In an ordinary co-partnership the members of it act as natural persons and as agents for each other, and with unlimited liability. But not so with a corporation; its members, as natural persons, are merged in the corporate identity."

In *Exchange Bank of Macon v. Macon Const. Co.*, 97 Ga. 1, 25 S. E. 326, 33 L. R. A. 800, the rule is stated:

"Every corporation is a person—artificial it is true, but nevertheless a distinct legal entity. Neither a portion nor all of the natural persons who compose a corporation, or who own its stock and control its affairs, are the corporation itself; and when a single individual composes the corporation, he is not himself the corporation. In such case, the man is one person created by the Almighty, and the corporation is another person created by the law. It makes no difference in principle whether the sole owner of the stock of a corporation is a man or another corporation. The corporation owning such stock is as distinct from the corporation whose stock is so owned as the man is from the corporation of which he is the sole member."

The case of *Missouri Pac. R. Co. v. Bolling* (Ark), 48 S. W. 806, furnishes a concise statement of the rule. Speaking of,

"Evidence tending to prove that the St. Louis, Iron Mountain & Southern Railway Company acquired a greater part of the stock of the Little Rock & Fort Smith Railway Company, and that the Missouri Pacific Railway Company acquired a greater part of the stock of the St. Louis, Iron Mountain & Southern Railway Company, and that several of the officers of the last mentioned companies were the same persons,"

the court said:

"But the evidence shows that the two companies remained separate corporations, and that they, by consent, appointed or selected the same persons officers in each company to reduce their expenses. The facts stated do not show that the existence of one was merged in that of the other. The corporations, and their officers and stockholders, are separate persons. The stockholders and officers might be the same and the corporations different."

To the same effect, *Porter v. Pittsburg etc. Steel Co.*, 120 U. S. 649, 670; *Jessup v. Illinois Central R. Co.*, 36 Fed. 735, 741; *White v. Pecos Land & Water Co.*, 18 Tex. Civ. App. 634, 45 S. W. 207; *Atchinson, Topeka & Santa Fe R. Co. v. Cochran*, 43 Kan. 225, 23 Pac. 15, 19 Am. St. 129, 7 L. R. A. 414; *Regina v. Arnaud*, 16 L. J. Q. B. 50.

The general law is laid down in Cook on Stock and Stockholders and Corporation Law, vol. 1, § 6:

"A corporation is an entity and existence separate from its officers and stockholders. And the inclination of some writers to assimilate a corporation as nearly as possible to a partnership and to apply to the former the rules applicable to the latter leads only to confusion and is contrary to the law. The difference between a corporation and a partnership and the advantages of a corporation over a partnership as a means of doing business are very marked and should not be limited by construction. A corporation is an entity, an existence, irrespective of the persons who own all its stock. The fact that one person owns all the stock does not make him and the corporation one and the same person. Although one railroad corporation owns all the stock of another railroad corporation, yet the separate existence of the two corporations continues and they are not thereby merged."

No authority is cited by the city to meet these cases. But we are asked to find as a fact that the traction company is controlled by the railway company, when the testimony shows that an independent company controls both of them. The underlying principle in all these cases, whether so stated or not, is the contract clause of the Federal constitution. Courts are powerless to compel one company, holding its own franchise, to contract with another, although a majority of the stock be held by the same persons, for the very obvious reason that courts cannot abrogate contracts formally entered into by competent parties. It may be a grave question whether mergers of corporate interests are to be more favored than the preservation of independence between corporations. In the absence of legislative direction, the courts have generally resolved against the policy of merging independent corporations, although in some cases hardship has followed the rule.

The city council of the city of Tacoma having failed to reserve the right to compel the two companies to transfer passengers, the courts are powerless to compel such transfers, so long as they are legally independent of each other. Courts cannot make contracts or supply omissions in contracts, or bind one company by the contract of the other. It may be that, at the time the franchise was granted to the traction company, the city purposely waived the right it might have retained to compel transfers with other lines, but whether the omission comes through design or oversight, the law is the same. The franchise and contract is binding upon both parties as it was written.

Reversed, and remanded with instructions to deny the writ.

RUDKIN, C. J., CROW, and MORRIS, JJ., concur.

DUNBAR, J. (dissenting)—I dissent. I have no fault to find with the principles of law which are enunciated by the majority opinion, or the rule laid down by the authorities therein cited, but think they have no application to this particular case. They apply to *bona fide* transactions and

actual conditions.   But from an examination of the record
in this case, I am convinced that appellant is attempting to
evade its obligations by a denial of the truth; certainly, so
far as the operation of the different tracks is concerned;
probably, so far as ownership is concerned.   The contractual
obligation was with reference to lines owned, operated, or
controlled; and, interpreting the actions of the appellant
rather than its assertions, if the proof in this case does not
sustain the city's contention that the appellant is at least
operating and controlling the traction line, then in my opin-
ion no proof which will satisfy the law can ever be made
where a bare denial is offered by the defendant.   These were
two lines built and operated as competing lines.   The com-
petition was intense, to the extent that ordinary courtesies
were refused.   There was no trackage connection and, of
course, no exchange of cars.   The traction company managed
its affairs in every particular.   But in 1909 the Puget Sound
Electric Railway purchased a majority of the stock of the
traction line, it already owning the stock of the railway com-
pany.   They are managed largely by the same directors.
Physical connections were then made.   The traction company
gave up its business office in Tacoma.   Cars of each company
are used on the lines of the other indiscriminately, a general
superintendent was appointed to take charge of both, and in
this appointment the traction company had no voice.   The
repair shops of the traction line were discontinued, and
machinery removed to the appellant's shops.   All of the
managing officers of the traction company quit its service,
and it passed absolutely and wholly into the hands of appel-
lant, and its identity was lost.   I am assuming, of course,
that the Puget Sound Electric Railway, the Tacoma Railway
& Power Company, and Stone & Webster are all the same con-
cern.   This assumption is justified by the testimony.   After
this merger, there was nothing left of the traction company
as an entity but the filmy system of bookkeeping where the
traction company is credited and charged as though it really

enjoyed a separate existence.    I am satisfied from the testimony that this is simply a subterfuge, and that the expense of the bookkeeping is many times repaid by the fees which are saved to the company through its agency.    The majority say:

"We would be glad to hold with the relator, for nothing can work greater hardship and inconvenience to the public than two lines of street railway, operating in the same community but denying the right of transfer.    But the legal effect of such ruling would be to make a judicial decree consolidating two companies which under their franchises were designed to be competing lines, a result generally held to be void on the ground of public policy."

This would be sound doctrine applied to two actually competing lines, but the legal effect of the majority opinion, as I read the testimony, is to permit the inconvenience and hardship which is regretted by the majority, in a case where the public is even deprived of the benefit of competition.

The judgment should be affirmed.