WESTERN MARYLAND RAILWAY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6475.   Promulgated June 27, 1928.

*George P. Bagby, Esq.*, and *Eugene S. Williams, Esq.*, for the petitioner.

*M. N. Fisher, Esq.*, for the respondent.

*Chester A. Gwinn, Esq.*, as *amicus curiae*.

890

894

900

OPINION.

MILLIKEN : All the facts were stipulated and our findings of fact conform to the stipulation of the parties.

With respect to its right to deduct from gross income for each of the years herein involved the sum of $80,796.24, petitioner contends (1) that the consolidation gave rise to no change of substance but only a change of form and (2) that the creation of a new corporate entity does not of itself give rise to a different taxable basis. In connection with the first contention, petitioner invites attention to the fact that Railway Company not only owned and operated its subsidiaries but that such subsidiaries in fact transacted no business, kept no separate books of account, and that Railway Company operated all as parts of a single system and then insists that the reorganization was but the legal recognition of an existing economic fact. In support of this contention, it cites *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330. That case turned upon " its very peculiar facts " and on these very peculiar facts it was held that, since the Southern Pacific Co. not only owned and operated the property of its subsidiary but also had in its treasury all its revenue and that since under such circumstances the declaration of a dividend would be only " a paper transaction," the Southern Pacific Co. was in possession of a certain income prior to March 1, 1913, although a formal dividend was not declared until after that date. In that case the question was when did a corporation come into possession of income. Here it is whether a consolidated corporation has by succession the same right of deduction that belonged to one of the consolidating companies. We do not feel justified in extending the reasoning of that case to a case wholly unlike it, unless cogent reasons therefor are presented, and before doing so, we should look into the origin of petitioner, the law under which the consolidation took place and the agreement of consolidation.

It is stipulated that petitioner was organized under article 23, sections 33 to 35, inclusive, of the Annotated Code of Maryland (Bagby's Edition) and certain Pennsylvania statutes. Putting to one side the Pennsylvania statutes, we will first look to the Maryland statutes. The pertinent parts of section 33 read:

(1) Any two or more corporations having capital stock, now existing or hereafter formed under any law or laws of this State, which have been or shall have

been duly authorized by law to carry on in whole or in part any kind of business of the same or a similar nature, may consolidate and by such consolidation form one new corporation; provided, however, that the provisions of this section and of Sections 34 and 35 of this Article shall not be held to repeal any of the restrictions imposed by this Article on the consolidation of railroads owning or operating competing or parallel lines, and provided further that any corporation which shall take advantage of this section shall be deemed to have waived all claim to exemption from taxation or from repeal or modification of its charter.

(2) Such consolidation shall be made in the manner following: There shall be an agreement of consolidation between the consolidation corporations giving: (a) the terms and conditions of the proposed consolidation; (b) the mode of carrying the same into effect; (c) the name of the new corporation; (d) the postoffice address of the place at which the principal office of the corporation in this State will be located as in the case of a certificate of incorporation and the name or names and postoffice address or addresses of the resident agent or agents who will be in charge thereof, as in the case of a certificate of incorporation; (e) the counties in this State in which any of the consolidating corporations own property, the title to which could be affected by the recording of an instrument among the land records, and if any of the consolidating corporations own such property in the City of Baltimore, the agreement of consolidation shall so state; (f) the number, names and addresses of the directors and the names of the officers, who shall act as such until their successors are duly chosen and qualified; (g) the amount of authorized capital stock of each consolidating corporation and the total amount of authorized capital stock of the new corporation and the number and par value of the shares; (h) the total amount of capital stock of the new corporation to be issued for stock of the consolidating comporations; (i) the restrictions, if any, imposed upon the transfer of the shares or of any of them; (j) if the capital stock is classified, the amount, par value, preferences, restrictions and qualifications of each class, specifying the amount of each class authorized and the amount of each class to be issued for stock of the consolidating corporations; (k) the manner of converting the capital stock of each of the consolidating corporations into stock of the new corporations; (l) all such other provisions and details which shall be deemed necessary to perfect the consolidation. * * *

This section further provides for the filing of the articles in certain offices and for the payment of certain organization fees. Section 34 in part provides:

When such agreement of consolidation has been delivered to the State Tax Commission with the fees required by Section 33 of this Article and the bonus tax, if any, payable, and not before, all of the property and assets belonging to said consolidating corporations of whatsoever nature and description, and all the powers and rights and all debts and liabilities of said consolidating corporations of whatsoever nature and description, shall be devolved upon said new corporation, which shall be regarded as substituted by operation of law in the room and stead of consolidating corporations; and from the time of the delivery of said agreement of consolidation, as aforesaid, any amendment or amendments made by said agreement of consolidation shall take effect, and not before.

Section 218 of the same article makes further provisions for the consolidation of railroad corporations and, among other things, provides that such consolidations may be made "upon such terms as may be agreed upon."

It may be observed in passing that the statute throughout refers to the consolidated corporation as a "new corporation"; that such new corporation is organized in much the same manner as any ordinary corporation; and that until the new corporation has complied with the statutory requirements, it does not acquire the property and assets of the consolidating corporations. The agreement of consolidation makes similar recitals and follows the statute. At this point, petitioner asserts:

There was no surrender or cancellation of the charter of the principal company, but the charter became that of the consolidated company (together with the charter of the subsidiaries, which, however, added no powers not provided for in the charter of the principal company). No charter power, and no right, privilege, or immunity was lost in the consolidation. The consolidation only welded together the principal company and the subsidiaries so as to embody them all.

In support of this contention, petitioner relies on *State, Use of Dodson* v. *Baltimore & Lehigh Railroad Co.*, 77 Md. 489; 26 Atl. 865. This case was reviewed by the same court in *Diggs* v. *Fidelity & Deposit Co.*, 112 Md. 50; 75 Atl. 517, where in an exhaustive opinion the court defines the status of a consolidated corporation under the laws of Maryland. In the Diggs case the facts were that a gas company had executed a mortgage to a trustee to secure bonds which were to be issued and sold for two purposes (1) to retire existing lien indebtedness and (2) for the acquisition of additional property by the company. The mortgage covered all the property the gas company then owned and all that it might thereafter acquire. Before all the bonds had been issued the gas company consolidated with another like company and one of the questions before the court was whether the trustee could issue bonds for the purpose of acquiring additional property for the consolidated corporation. This right the court denied. We make the following excerpts from the opinion:

In the case of *State* v. *Consolidated Gas, Electric Light & Power Company*, 104 Md. 364, 65 Atl. 40, it was held by us that the very consolidated corporation with which we are now dealing, was a new corporation, and as such was liable for the bonus tax, imposed by section 98 of Article 81 of the Code upon corporations as a condition precedent to commencing to do business. We have also held to be new corporations other consolidated companies formed under the same or similar statutes in the case of *State, Use of Dodson,* v. *B. & L. R. R. Co.*, 77 Md. 489, 26 Atl. 865, and in three cases of *State* v. *Northern Central Ry. Co.*, appearing respectively in 44 Md. 131, 90 Md. 447, 45 Atl. 465, and 93 Md. 737, 51 Atl. 1108. . Our decision in those cases is in accord with the great weight of authority. 10 Cyc. 302; *Yazoo & Miss., Ry. Co.* v. *Vicksburg*, 209 U. S. 358, 28 Sup. Ct. 510, 52 L. Ed. 833; *Rochester Ry. Co.* v. *Rochester*, 205 U. S. 256, 27 Sup. Ct. 469, 51 L. Ed. 784; *Keokuk & Western Ry. Co.* v. *Missouri*, 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450.

We held in *State, Use of Dodson,* v. *B. & L. R. R. Co.*, 77 Md. 489, 26 Atl. 865, *supra*, and *Consolidated, etc., Co.* v. *Baltimore County*, 98 Md. 689, 57 Atl. 29,

that the new corporation, which comes into being by a consolidation of corporations made under the general corporation laws of this state, comprehends both of the constituent corporations which then ceased to exist and is in effect both united in one, and that nothing was destroyed by the consolidation, and that it was the purpose of the Legislature in providing for such consolidations to enable the constituent corporations to do more efficiently what they had done before and not to deprive them of any rights or property which they previously had. It is however true that the means adopted by the Legislature to carry into effect its purposes involved the extinction of the life of the constituent corporations and the creation of a new corporation which is a legal unit and not a mere association or aggregation of coexisting corporations. The rights and powers received by it, from the state, at its formation, although identical in character with those which had been possessed by the extinct constituent corporations, are its own rights and powers and are exercisable by it alone. The property and franchises formerly held by the extinct constituent corporations, which devolved through the consolidation on the new corporation, thereby became its own and are held by it in its own right with the same powers of use and disposition as those enjoyed by other corporate owners of property and the respective portions of it which came from the several constituents no longer have any separate legal existence. It may in its discretion apply particular portions of its property to like uses and in the same enterprises to those in which they had been formerly employed by the constituent corporations from which they came, but in so doing it holds and uses the property in its own right and on its own account, and not as and for the extinct constituent corporation or in a special capacity as its successor.

   *       *       *       *       *       *       *

In *New York Security and Trust Company* v. *Louisville, etc., R. R. Co.* (C. C.) 102 Fed. 382, two railroad companies, on the property of each of which there was a mortgage, entered into a consolidation, and the new company thereby formed made a general mortgage upon the combined properties. All three of the mortgages covered after-acquired property. A controversy arose between the trustees of the three mortgages as to the proper disposition of equipment purchased by the consolidated company. The trustees of the two underlying mortgages which had been made by the constituent companies contended that a proportionate part of the equipment should be deemed to have come under each of the divisional mortgages but the court rejected the contention saying, " The after-acquired property clause in each of the mortgages can be rightly construed I think to apply only to property subsequently acquired by the mortgagor. The consolidated company is a new and different organization. The case of *Hinchman* v. *Railway Co.* [14 Wash. 349], 44 Pac. 867, is quite in point and in principle the question seems to be covered by the decision in *Pullman Pal. Car Company* v. *Missouri Pac. Ry. Co.*, 115 U. S. 587."

We think that, in the present case also, the after-acquired property for account of which bonds were authorized to be issued by the terms of the gas company's mortgage should be construed to mean only property subsequently acquired by that company. As that company put it out of its power to acquire any more property when it surrendered its corporate existence by entering into the consolidation, that action on its part is conclusive of this branch of the case.

In *State* v. *Northern Central Railway Co.*, 44 Md. 131, referred to in the above opinion, it was held that a consolidated railroad company, which was consolidated under a special act in many respects similar to the statute here involved, was the creation of the act per-

mitting the consolidation and was in no sense created by the articles of consolidation and further that the rights and privileges which it acquired from its predecessor were acquired not by the transfer but as new and special grants under the act permitting the consolidation. The decision of the court in this case was affirmed by the Supreme Court of the United States in *Northern Central Railway Co.* v. *Maryland*, 187 U. S. 258.

It thus clearly appears that the Railway Company which issued the bonds herein involved is extinct; that petitioner is not a mere association or aggregation of coexisting corporations, but a new and distinct corporation; and that it owns its property and franchises in its own right and not in the capacity as successor to the consolidating corporations. Under the agreement of consolidation it assumed the indebtedness of all the consolidating corporations. It would have become liable for such indebtedness under section 33 of article 23, even though no such provision had been included in the articles of consolidation. The mortgage debt which is here involved and which petitioner assumed was the debt of another and distinct entity. The money that was received in exchange for the bonds was received not by petitioner but by another corporation and used by that corporation perhaps for the purchase of assets received by petitioner by reason of the consolidation and which, for all we know, may have enhanced in value. At any rate, petitioner came into possession of the assets of Railway Company and in consideration thereof agreed to pay the mortgage bonds herein involved and the contract rate of interest thereon. What was received by Railway Company in exchange for its bonds was of no concern to petitioner. Its obligation began with the date of the consolidation and the debt which it now owes, it owes in its own right, both by reason of the statutory provisions and the contractual assumption, and not as a successor to or the representative of the Railway Company. Such being the case, it has no right to take as a deduction as a loss or otherwise any part of the difference between the face value of the bonds and what was received by the Railway Company. In reaching this conclusion, we have not considered the interesting questions which arise from the fact that some of the consolidating corporations were of Pennsylvania origin and the further fact that the Railway Company, in so far as it appears from the record, was a corporation of Maryland only, whereas petitioner is both a Maryland and a Pennsylvania corporation.

But, whatever may be the rights which petitioner derived from the consolidation, neither it nor the Railway Company is entitled to deduct from gross income an amortized proportion of the discount. See *Commissioner of Internal Revenue* v. *Old Colony Railroad*, 26 Fed. (2d) 408.

Relative to the 2 per cent tax borne by the Director General, respondent admits that if petitioner and the Railroad Administration had, pending Federal control, entered into the contract provided by section 1 of the Federal Control Act, this proceeding would be controlled by *New York, Ontario & Western Ry. Co.*, 1 B. T. A. 1172, and that the normal tax for each of the years (1918 and 1919) should be reduced by 2 per cent, but contends that in the absence of such contract, petitioner is relegated to section 3 of the Act, with the result that it is not entitled to the benefits of the contract but only to a just compensation for the taking of its property.

There is no merit in respondent's contention that petitioner was relegated to section 3 for his remedy. Section 1 provides that the President is authorized " to agree with and guarantee to " any carrier whose railroad was taken over by him just compensation within the limits thereafter set forth. The Act then provides the stipulations which may be inserted in the contract, including the one relative to taxation. Sections 2 and 3 contain the following provisions:

Section 2. If no such agreement is made, or pending the execution of an agreement, the President may nevertheless pay to any carrier while under Federal control an annual amount, payable in reasonable installments, not exceeding ninety per centum of the estimated annual amount of just compensation remitting such carrier, in case where no agreement is made, to its legal rights for any balance claimed to the remedies provided in section three hereof. Any amount thereafter found due such carrier above the amount paid shall bear interest at the rate of six per centum per annum. The acceptance of any benefits under this section shall constitute an acceptance by the carrier of all the provisions of this Act and shall obligate the carrier to pay to the United States, with interest at the rate of six per centum per annum from a date or dates fixed in proceedings under section three, the amount by which the sums received under this section exceed the sum found due in such proceedings. (40 Stat. 453.)

Section 3. All claims for just comepnsation not adjusted (as provided in section one) shall, on the application of the President or of any carrier, be submitted to boards, each consisting of three referees to be appointed by the Interstate Commerce Commission, members of which and the official force thereof being eligible for service on such boards without additional compensation * * *.

It is at once apparent that petitioner's compensation was not determined under section 3. There was no reference to any board. The compensation was adjusted by agreement and therefore under section 1. We can perceive no difference in principle between this case and *New York, Ontario & Western Ry. Co.*, *supra*, and the only difference in fact is that in one case the agreement was made after the taking and before the release of the property and in this proceeding the agreement was made subsequent to both events. In both cases the amount of compensation was reached by agreement and in both cases the same standard of measurement was used. In *United States* v. *Pittsburgh & West Virginia Railway Co.*, 271 U. S. 310, it

was held that a railroad which " failed to make any agreement with the Railroad Administration as to just compensation to be paid for the use of their properties until final settlement was made " was not entitled to the benefits of the standard contract, on the sole ground that it returned all its income arising from Federal control as income received in the year 1921 (a state of affairs which does not exist in this proceeding) and had asserted and had respondent hold that " none of it was attributable to the period of federal control." The court said:

The provisions of §6 of the standard form of contract, the Federal Control Act and the Revenue Acts are to be read together. When this is done, it is clear that the obligation of the Director General to bear the normal income taxes of the corporations did not go beyond those assessed for the period of federal control. That obligation was not held down to the normal tax on amounts received as compensation for the use of their properties, but extended to the normal tax assessed for that period on all incomes taxed without regard to source. But it cannot be held to extend to taxes on incomes for 1921 without excluding from consideration the provisions of the Federal Control Act and standard agreement clearly limiting the obligation to taxes assessed for the period of federal control. The meaning of these provisions is plain. There is no room for construction. The period in which the assessments were made governed. The sources of taxable incomes were not regarded. It would be contrary to the plain language of the statute and contract to hold the United States liable for any part of the taxes for 1921. Plaintiffs were not entitled to recover.

It is to be noted that although the railroad company in the above case did not enter into the standard contract, that contract was made a determining factor in ascertaining the railroad's rights in a case which was settled by agreement and not under section 3. In this proceeding the settlement was not made by a board under section 3, but was fixed by agreement and therefore under section 1. For these reasons we are of opinion that petitioner is entitled to the benefits of subdivision (b) of section 230 of the Revenue Act of 1918.

Respondent affirmatively pleads that he erred in allowing to petitioner a deduction of $1,924.74, being a part of a total payment of $3,079.50 made in 1919 by petitioner to the Association of Railway Executives, the said amount of $1,924.74 being paid for the purpose of promoting railroad legislation. The same question was presented in *Texas & Pacific Railway Co.*, 9 B. T. A. 365, on the same facts that are in evidence in this proceeding. For the reasons given in that opinion, we hold that respondent has not met the burden of proof imposed upon him. Under the facts as herein presented, the allowance of the deduction should not be disturbed. Cf. *Great Northern Ry. Co.*, 8 B. T. A. 225.

Respondent further affirmatively pleads that he erred in failing to increase petitioner's taxable income for the year 1919 by the sum of

$13,885.03, which represents additional compensation paid by the Post Office Department to petitioner in the year 1920, for services rendered during the period June 30, 1916, to December 31, 1917, in transporting United States mails. The reason advanced by respondent for this contention is that it was not known until December, 1919, what would be the precise amount which petitioner would receive for the services rendered in 1916 and 1917, and further that there was a controversy between the Government and petitioner as to the amount of its compensation which was not settled until the finding was made by the Interstate Commerce Commission on December 23, 1919.

From March 3, 1873, to November 1, 1916, the Government paid for the transportation of the mail on the basis of weight with additional payment to those railroads which operated R. P. O. cars of greater length than 40 feet.

Section 5 of the Act of July 28, 1916, 38 Stat. 425, in part provides:

That the Postmaster General is authorized and directed to readjust the compensation to be paid to railroad companies from and after the thirtieth day of June, nineteen hundred and sixteen, or as soon thereafter as may be practicable, for the transportation and handling of the mails and furnishing facilities and services in connection therewith upon the conditions and at the rates hereinafter provided.

Then follow provisions for maximum rates to be paid on the basis of space used. Section 5 contains the following provisions:

All railway common carriers are hereby required to transport such mail matter as may be offered for transportation by the United States in the manner, under the conditions, and with the service prescribed by the Postmaster General and shall be entitled to receive fair and reasonable compensation for such transportation and for the service connected therewith.

The Interstate Commerce Commission is hereby empowered and directed as soon as practicable to fix and determine from time to time the fair and reasonable rates and compensation for the transportation of such mail matter by railway common carriers and the service connected therewith, prescribing the method or methods by weight, or space, or both, or otherwise, for ascertaining such rate or compensation, and to publish the same; and orders so made and published shall continue in force until changed by the commission after due notice and hearing.

In fixing and determining the fair and reasonable rates for such service the commission shall consider the relation existing between the railroads as public service corporations and the Government, and the nature of such service as distinguished, if there be a distinction, from the ordinary transportation business of the railroads.

\*　　\*　　\*　　\*　　\*　　\*　　\*

At the conclusion of the hearing, the Commission shall establish by order a fair, reasonable rate or compensation to be received, at such stated times as may be named in the order, for the transportation of mail matter and the service connected therewith and during the continuance of the order the Postmaster

General shall pay the carrier from the appropriation herein made such rate or compensation.

\* \* \* \* \* \* \*

The existing law for the determination of mail pay, except as herein modified, shall continue in effect until the Interstate Commerce Commission under the provisions hereof fixes the fair, reasonable rate or compensation for such transportation service.

On December 23, 1919, the Interstate Commerce Commission made its reports (56 I. C. C. 1). The Interstate Commerce Commission found, subject to certain modifications, that the space system should be extended to all mail routes and fixed the rates which it held were "the fair and reasonable rates for the transportation of mail matter as of November 1, 1916, and to January 1, 1918 \* \* \*." Thereafter, payment was made to petitioner as above set forth. Respondent asserts that under the rule laid down in *Bump Confectionery Co.*, 4 B. T. A. 50, and in similar cases, petitioner should not be permitted to accrue its compensation. In the cases referred to, the petitioners had breached certain contracts and had admitted no liabilities. In this proceeding there was no breach of contract. There was no denial of liability. Under the Act of July 28, 1916, petitioner was entitled to and the Interstate Commerce Commission was directed "to fix and determine \* \* \* the fair and reasonable rates and compensation for the transportation of such mail matter by railway common carriers \* \* \*." Petitioner was entitled at all events to a reasonable compensation for its services. There was no dispute about that. All that remained was for the Interstate Commerce Commission to determine what constituted such compensation. There was no greater uncertainty about the amount due than existed with respect to the compensation of those railroads which were taken over by the President for war purposes and where the standard form of contract was not entered into. In several cases, where the taxpayer kept his accounts on an accrual basis, we held that all such income should be returned for taxation for the year in which it was earned for the reason "that a taxpayer's net income is not clearly shown unless all the items of income are first set up and included in the amount from which the accrued deductions are subtracted." In the instant case, the income was earned in the years 1916 and 1917 and the expenses incident to the earning of that income were paid or incurred in these same years. If petitioner was on an accrual basis, and we assume such to be the case, the payments received in 1920 should have been allocated to and returned for the years in which they were earned, to wit, 1916 and 1917. See *Illinois Terminal Co.*, 5 B. T. A. 15; *Great Northern Railway Co.*, *supra;* and *Texas & Pacific Railway Co.*, *supra.*

The years 1916, 1917, and 1920 are not before us. We limit our opinion to the year 1919 and hold that no part of the payment made by the Post Office Department in 1920 was taxable income in 1919.

The other issues should be settled in accord with the facts found.

*Judgment will be entered under Rule 50.*