BROWN et al. v. PENNSYLVANIA R. CO.

PENNSYLVANIA R. CO. v. BROWN et al.

(Circuit Court of Appeals, Third Circuit. April 1, 1918.)

Nos. 2319, 2320.

1. APPEAL AND ERROR ⟨⟩1022(1)—REVIEW—FINDINGS.

A finding of fact by the master, approved by the trial court, will not be disturbed on appeal, unless it appears from the evidence that both the master and the court had made a clear mistake.

2. CANALS ⟨⟩21—BONDS—ACQUISITION—VIOLATION OF CONTRACT.

In a suit between bondholders of a canal company and a railroad company, which controlled the canal company and had agreed to purchase unpaid interest coupons detached from the bonds of the canal company, evidence *held* insufficient to show that the railroad received bonds of the canal company in exchange for moneys it advanced to pay interest coupons, which it was bound to purchase on default.

3. JUDGMENT ⟨⟩736—CONCLUSIVENESS—MATTERS CONCLUDED.

A decree finding a railroad company liable for the failure of a canal company, which it controlled, to make sinking fund appropriations as required by a mortgage given to secure bonds, and which ordered the railroad company to make payments to the sinking fund, was not a conclusive adjudication as to the distribution of such fund, and that question might be raised in subsequent proceedings, for the sinking fund was not then in existence.

4. MORTGAGES ⟨⟩99—CONSTRUCTION—PURPOSES FOR WHICH MADE.

A mortgage should be construed, not arbitrarily by its terms, but with reference to the purposes for which it was made and the objects intended to be achieved in its operation.

5. CANALS ⟨⟩21—MORTGAGES—CONSTRUCTION.

The Pennsylvania Railroad Company purchased a system of canals from the state, which for a number of years it operated directly, and then organized the Pennsylvania Canal Company, to which it transferred the property, taking practically all of its stock in payment. Thereafter it controlled the canal company through such stock ownership. On its organization, the canal company made an issue of bonds secured by mortgage, to which contract the railroad company became a party by agreement to purchase interest coupons on their maturity in case of default by the canal company. The mortgage also required the canal company to provide out of its net earnings, if sufficient for that purpose, a sinking fund of $20,000 per annum, but, if not sufficient therefor, then such sum as should be equal to the net earnings, for the payment of the principal of the bonds secured. Other provisions of the contract provided that, on default in payment of principal or interest, the trustee might enter and take possession of the property of the canal company, and appropriate the net income to payment in full, first, of the interest, and, second, the principal. *Held* that, as the railroad company induced holders of underlying securities, which were first liens on the property, to take bonds secured by the mortgage, and as the principal and interest might well exceed the amount to be realized from the sinking fund, the principal of the bonds is payable out of the sinking fund in priority to interest coupons.

6. EQUITY ⟨⟩394—MASTER—FEES.

A master's fee of $20,000 is excessive by at least $10,000, where the service rendered was found in a few brief meetings, held at intervals during a period of less than three months, and in the preparation of two reports, which, while thorough, could not have been difficult, and could not have occupied more than two months, had the master done nothing else.

7. ATTORNEY AND CLIENT ☞141—COUNSEL FEES—ALLOWANCE.

An award of $200,000 in favor of attorneys for holders of the bonds of a canal company, who recovered from a railroad company, which controlled the latter, nearly $2,000,000, *held* excessive.

8. ATTORNEY AND CLIENT ☞155—COUNSEL FEES—ALLOWANCE.

Where the general bondholders of a canal company, which was controlled by a railroad company, recovered against latter and compelled it to pay a sum of nearly $2,000,000 for distribution among the bondholders, the proceeding must be deemed adverse as to the railroad company, though it held some bonds of the canal company, and, in allowing attorney's fees, nothing should be charged against the bonds held by the railroad company, for otherwise the principle that counsel fees are not recoverable from the adverse party to the cause might be violated.

Cross-Appeals from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit by Alice Frances Brown and others against the Pennsylvania Railroad Company and others. From the decree (244 Fed. 980), complainants appeal, as does the named defendant. Reversed, with directions.

Thomas Raeburn White and John Cadwalader, Jr., both of Philadelphia, Pa., for plaintiffs.

John Hampton Barnes and Francis I. Gowen, both of Philadelphia, Pa., and Charles Evans Hughes, of New York City, for defendant railroad company.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The questions in these cross-appeals arose on the distribution of a fund which was paid under a decree of the District Court (229 Fed. 444), affirmed by this court (235 Fed. 669, 149 C. C. A. 89), holding the Pennsylvania Railroad Company liable for the sinking fund of the General Mortgage of the Pennsylvania Canal Company.

The trustee of the mortgage filed a petition showing that the railroad company had paid him $1,923,408.16—the principal and interest of the amount decreed—and praying instructions as to its distribution. The court referred the matter to a master. The master's findings are substantially as follows:

(1) That there are $1,948,000 bonds outstanding, and $2,590,354.03 unpaid interest coupons outstanding and held exclusively by the Pennsylvania Railroad Company, including coupons detached and purchased and coupons still attached to bonds it owns;

(2) That the fund should be applied to payment of the principal of the bonds in preference to payment of interest coupons;

(3) That of the total number of bonds outstanding, the Pennsylvania Railroad Company validly owns 384, the principal of which, like that of bonds otherwise held, is payable out of the fund before interest;

(4) That no compensation shall be allowed the Committee of bondholders for its services in prosecuting this litigation, but that the sum

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of $3,406.87 be allowed for its expenses, and the sum of $250,000, be allowed plaintiff's counsel as fee for prosecuting the litigation and raising the fund; and

(5) That all bonds participating in the fund (including those held by the railroad company) shall contribute ratably to the payment of these allowances.

On exceptions by both parties, the court affirmed all the master's findings except the allowance for counsel fees, which it reduced to $200,000, and then added a master's fee of $20,000. Both parties appealed from the decree, specifying errors which we shall state as we approach the consideration of the several questions they raise.

## Appeal of Alice Frances Brown et al.

As this controversy in its present stage is between the main body of bondholders on the one hand and the Pennsylvania Railroad Company as an individual bondholder on the other, we shall for convenience refer to the former as the general bondholders and to the latter as the railroad company.

The general bondholders assert error in the part of the decree by which the railroad company was allowed to prove its bonds and participate in the fund. They base their charge on the allegation that the bonds proved were given the railroad company in exchange for moneys it had advanced the canal company to pay interest coupons which the railroad company had contracted with the bondholders to purchase on default, and that bonds which the railroad company received in a transaction whereby it prevented a default to escape its liability to purchase, were in effect acquired by a violation of its contract, and are not, therefore, validly provable against the fund.

[1] We need not discuss now whether in thus acquiring bonds the railroad company violated its contract with the bondholders, for the first question is whether the bonds were so acquired. That is a question of fact and on that question the master has found that the facts do not warrant the inference upon which the charge is made. On exception, the court approved the master's finding.

We are bound to sustain this finding, under the familiar rule, unless it appear from the evidence that both master and court have made a clear mistake.

[2] The evidence, which is not in dispute, is briefly this: Moneys were advanced from time to time by the railroad company to the canal company for a variety of purposes, amounting by the end of 1873 to $1,465,200. Of this sum, $232,000 had been advanced admittedly to aid the canal company in paying interest on its bonds. On the last day of that year, the canal company gave to the railroad company 10,000 shares of the stock of the Susquehanna Coal Company at par and thereby discharged $1,000,000 of this obligation, leaving a balance of $465,200 due the railroad company. As the credit of $1,000,-000 was entered generally, it was doubtless applicable to the earliest items of the account, and discharged in part an item of $1,023,200 brought over as a balance from the previous year. This left, on December 31, 1873, a balance of $465,200, which included the $232,000

advanced for interest. During 1874, this balance was increased by advances made for different purposes—but not for interest payments —until it reached the sum of $681,650. This amount was balanced on December 31, 1874, by an entry of "By Sundries, $681,650." The evidence shows that the item of sundries was made up of 3,000 shares of the stock of the Susquehanna Coal Company at par and 449 bonds of the canal company at 85, of which the 384 bonds now proved against the fund were a part. It will be observed that either the stock of the coal company or the bonds of the canal company was greater in value than the interest advances for which either one or the other was a repayment. Here the evidence stops. There is nothing to indicate ever so remotely to what indebtedness, whether for interest advances or for other advances, the coal shares or the canal company bonds were intended to be applied. There being no question that the canal company had a right to borrow money to pay interest and to discharge its obligation therefor by shares of the coal company which it owned, and without determining its right to discharge that obligation with its bonds, the master was of opinion that the controversy narrowed down to a question of how the payment should be applied where neither debtor nor creditor had made an application. He held that in the absence of evidence it should be presumed that both parties did the lawful thing rather than the unlawful thing, and that, accordingly, the coal shares were applied to the liquidation of interest advances and the canal company bonds to the liquidation of advances for other purposes, to which, admittedly, they might lawfully be applied. In the state of the evidence, we do not see what else the master could have done. Whatever the fact was, it was not here shown that the acting parties applied the canal bonds to discharge an indebtedness for interest advances. We, therefore, approve the master's finding that the facts do not sustain the contention that the railroad company's bonds were acquired in exchange for money lent for interest payments, and affirm that part of the decree which sustained this finding.

## Appeal of the Pennsylvania Railroad Company.

[3-5] The railroad company offered to prove before the master $2,590,354.03 interest coupons (a part of which it had purchased under its contract with the bondholders and the remainder it had acquired with its bonds), and claimed, that under the terms of the canal company mortgage, interest coupons have priority over the principal of bonds in the distribution of the sinking fund. The court sustained the master and gave the mortgage just the opposite construction. The railroad company, maintaining that the question of relative priority of interest and principal of the bonds in the distribution of the sinking fund had not been determined and foreclosed by the previous decree of this court (235 Fed. 669, 149 C. C. A. 89), now raises the question inter alia by its appeal.

When the case was last in this court the principal questions submitted were two (235 Fed. 669, 676, 149 C. C. A. 89). The first involved a construction of the sinking fund clause of the mortgage and concerned the method of computing annual appropriations to the sink-

ing fund from net annual earnings of the canal company. This question turned upon the inclusion or exclusion·of annual interest charges on the bonds as a factor of expense before determining net earnings. The second question related to the conduct of the railroad company toward the canal company and to its liability for the canal company's failure annually to make the sinking fund appropriations required by the mortgage. The decision of this court upon these two questions was, that the railroad company was liable for the failure of the canal company to maintain the sinking fund (a phase of the case with which we are no longer concerned) and that net earnings, out of which sinking fund appropriations were to be made, was the difference between gross earnings and operating and other expenses, in calculating which interest on the bonds was not to be included. In thus construing the sinking fund provision with reference to the maintenance of the fund, this court did not construe the provision with reference to its purpose or decide priorities in the distribution of the fund, for, at that time, the sinking fund was not in existence and nothing had been done that called for such construction, although, from the character of the decision the inference that the sinking fund was provided for the payment of principal was inevitably apparent. But now the fund has been created and its distribution has been ordered, and the question of distribution may properly be raised, notwithstanding the inference of the previous decision. We shall discuss the question, therefore, as though it were raised for the first time, at the risk of repeating very much of what we said before, because of the inseparable relation of the question before decided and the question now submitted.

The sinking fund provision of the mortgage is in these words:

"First. That the party of the first part (Canal Company) will first provide in each year, out of the net annual earnings, if sufficient for that purpose, a sinking fund of $20,000 per annum, but if not sufficient therefor, then such sum as shall be equal to the said net annual earnings, *for the payment of the principal of the bonds hereby secured* * * * and the same shall from time to time be invested by the said party of the first part in the bonds hereby secured, or in other good securities."

We are asked by the railroad company, the holder of interest coupons in amount greater than the fund, to interpret a provision which directs that the canal company shall "first provide * * * a sinking fund * * * for the payment of the principal of the bonds," as meaning a sinking fund provided first for the payment of the *interest* of the bonds. It is urged that such interpretation, although involving the deletion of words expressly employed and the substitution of others, is not only justified but is actually required to give the provision a construction consonant with the general purpose of the mortgage as indicated by its other provisions.

The other provisions of the mortgage adverted to are those which very certainly give priority to interest over principal in certain securities, and which, on default, give a like priority in the distribution of moneys arising from them. These provisions briefly stated, are, that if the canal company shall default in payment of principal or interest, the trustee of the mortgage may enter upon and take possession of the canal estate, operate the same and appropriate the net income to the

payment in full, "*firstly, of the interest* due on, and secondly, of the principal of all the aforesaid bonds;" or the trustee may, after entry, proceed to sell the canal estate at public sale and appropriate the purchase money "to the payment as aforesaid, *firstly, of the interest* due on, and secondly, of the principal of the said outstanding bonds."

The principal of the bonds was not due until their maturity.

The mortgage further provides that the canal company, with the consent of the trustee, may at any time sell any part or all of the mortgaged premises, free and clear of the lien of the mortgage, and that the proceeds of such sales shall be invested either in the improvement of the mortgaged property remaining or in the purchase of other property, which shall be subject to the trust of the mortgage (including that of sale), or in the purchase of the bonds secured by the mortgage, which shall then be canceled.

Of course, the sinking fund provision should be construed not by its terms alone, but with reference to all other provisions of the mortgage. And, similarly, the mortgage should be construed not arbitrarily by its terms, but with reference to the purposes for which it was made and the objects intended and achieved in its operation. Pullman's Palace Car Co. v. Missouri R. R. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499.

The purposes for which the mortgage was given are shown in part by the mortgage itself and were fully disclosed by the evidence in the previous consideration of this case, upon which the court held the railroad liable for the canal company's default in maintaining the sinking fund. As we found the relation between the canal company and the railroad company was such that the legal fiction of separate corporate responsibility based upon different corporate existence had disappeared, we viewed the railroad company as an actor in the affairs of the canal company, which include the making of this mortgage. As that decision has not been disturbed, we shall regard the railroad company in this discussion not merely as a collateral participant, but as the director of the mortgage transaction, without repeating the evidence, which, in the former case, led us to this conclusion.

A casual reading shows very clearly that this is not an ordinary mortgage made between borrower and lender, having for its object nothing more than the borrowing of money and the giving of security for its return. No such mortgage as this would conceivably be made to cover such a plain financial transaction. The mortgage discloses a very different transaction—one that had its rise in a situation which made the mortgage either expedient or necessary. This situation touches the railroad company, shows its connection with the mortgage, the objects for which the mortgage was given, and illumines the peculiar provisions made for securing the payment of the debt.

In our previous decision, we gave at some length the history of the Pennsylvania Canal Company and its relation to the Pennsylvania Railroad Company (235 Fed. 669, 676–681, 149 C. C. A. 89), as it bore upon the question then under consideration. We find it necessary briefly to repeat this history as it bears upon the question now submitted for decision.

In 1857 the railroad company acquired from the State of Pennsylvania a canal system made up of a number of independent canals, which, when connected, paralleled the right of way of the railroad company practically from Harrisburg to Pittsburgh, passing through and in a way pre-empting most of the advantageous passages through the mountain range. From 1857 to 1866, the railroad company operated these canals as its canal division.

When the canals were acquired they were encumbered by mortgages given to secure bond issues aggregating about $2,300,000. The mortgages were mostly first liens on the canal properties. For the equity in the canals, that is, for the canals over and above the securities which encumbered them, the railroad company paid the State $7,500,000.

It is fair to assume that in paying for these properties what in that day was a very considerable sum, the railroad company considered them worth what it paid for them, for several very obvious and then entirely lawful reasons. In acquiring ownership of the canal properties, the railroad company acquired control of an active competitor in its business of transportation. It evidently desired this control for what were then three legitimate objects, namely: (1) The absorption, so far as desirable, of a competitor's business; (2) the acquisition of a competitor's physical property, when and so far as the railroad company needed it; and (3) the exclusion of any competitor from the territory and mountain passes through which the canals ran. While the railroad company could readily attain the first and last of these objects so long as it held the canals in the form in which it originally acquired them, it could not attain the second, namely, the acquisition of the canal properties free of the liens of the underlying mortgages. Therefore, before the railroad company could take the canal properties for use in rail transportation it had to get rid of the canal obligations, either by paying them with its own money or causing them to be replaced by a new kind of obligation. In its annual report of 1865, it signified its intention to do the latter, "by the organization of a separate company for these works" and by raising money "by a mortgage upon them." In furtherance of its expressed intention, the railroad company, under authority of the Act of May 1, 1866 (P. L. 1068), caused the Pennsylvania Canal Company to be incorporated, and conveyed to it all its canal properties in return for the stock of the corporation. A few years later the canal company was authorized to borrow money and pledge its property by mortgage (Act of June 2, 1870, P. L. 1318), and, thereupon, this mortgage was made to secure a bond issue larger than the total of the bonds secured by the underlying mortgages. The primary purpose of this mortgage as declared at the time was to take up the underlying mortgages and to raise a small amount of money for improvements.

When the mortgage was made, the railroad company owned the entire stock of the canal company except a few shares. Before the bonds were offered, and at all times afterward, the railroad company elected the president of the canal company and its Board of Directors, the members of which were selected almost exclusively from the Board of Directors of the railroad company. It also named the orig-

inal trustee for the mortgage and the succeeding trustees, who were almost always the president of the railroad company.

When the bonds were issued, they were not first offered to the public for purchase; they were offered to the holders of the underlying bonds of the canal company, who were asked to exchange their bonds for bonds of the new issue. It is fair to assume that the $2,300,000 bonds, being first liens upon the canal properties, were good securities, especially in view of the fact that the railroad company had only a few years before paid $7,500,000 for the equity in the properties. The business of the company was then represented as good and as promising improvement. In order to induce the holders of the underlying bonds to exchange their perfectly good first lien securities, it is very clear that the canal company and the railroad company had to offer bonds that appeared just as good. In asking the holders of the underlying bonds to make the exchange, did the railroad company and the canal company ask them to surrender their first lien obligations and take in lieu thereof obligations that as to principal were not first liens at all, and as to interest were first liens only so long as the canal company and the railroad company chose to let them remain such? This is exactly what the two companies did. But if this were all they did, it could indeed be thought that the 2,300 holders of first lien obligations might hesitate to exchange them for obligations that were not a first lien as to principal and were a kind of defeasible first lien as to interest. And so apparently thought the railroad company, for in dealing with the holders of the underlying bonds the railroad company offered more. It said in effect, that it owned the canal company; that the canal properties though nominally owned by the canal company were purchased with the money of the railroad company and were virtually owned by it; that these properties were then really nothing more than what they were before, namely, a department of the railroad system; that the railroad company expected to need the canal land from time to time in its business of rail transportation and would want to take it as it might need it, paying for it, of course, all that it is worth, but without being brought in contact with competing rail carriers in its purchase. It was therefore indicated, that, while the proposed mortgage was a lien upon the property of the canal company as a security for the payment of interest and principal of the new bonds, it would be necessary to put the canal company in a position to sell its property free from the lien of the mortgage whenever it desired to do so. It was recognized that such sales free of the lien of the mortgage, would of course, reduce substantially the security of the bondholders, and might destroy it entirely. But in consideration of the right of the canal company to sell its properties—and consequently to take away the security primarily offered for the bonds—something which was considered just as good was offered. This was the obligation of the railroad company to purchase all interest coupons on which the canal company might default. And, therefore, the bondholders were assured that *as to interest* they were secured temporarily by the property of the canal company and permanently by the obligation of the railroad company.

But assuming that the holders of the underlying bonds knew that the undertaking of the railroad company was not a guaranty for payment but was a purchase of coupons, and that coupons thus purchased on default, were, in the hands of the railroad company, a first lien on the proceeds of sales of the canal properties (as afterward decided by the Supreme Court of Pennsylvania), they might naturally be expected to ask in considering the exchange, how the principal of the new bonds was to be secured and paid. The canal company (acting through its officials, who were also officials of the railroad company) did not wait to be asked this question but answered it before it was asked by issuing a prospectus in which it said to the holders of the underlying bonds and to prospective purchasers, that, under the scheme of this mortgage, the payment of interest is not only secured by the obligation of the railroad company to purchase interest coupons, but the mortgage, in its very first provision, provides for the payment of the principal. This, it pointed out, was done by a provision for a sinking fund, which, increased by annual payments and interest accumulations, would grow to an amount, which, at the maturity of the mortgage, would be sufficient to pay "the principal of the bonds."

Upon this representation the holders of the underlying bonds made the exchange and acquired the new issue.

We are not concerned in this phase of the litigation with what transpired afterward, beyond the fact that the canal company with the consent of the trustee of the mortgage, sold its property from time to time to the railroad company, until the latter acquired nearly all of it, for which, we have previously found, it paid adequate considerations; and beyond the further facts that the railroad company kept its contract and purchased all interest coupons on which the canal company defaulted, that a sinking fund has been established, that the mortgage has matured, and that the general holders of the bonds are now asking, in the language of the sinking fund provision, that the sinking fund be applied "to the payment of the principal of the bonds."

In opposing the contention of the general bondholders, the railroad company maintains that its contention that the sinking fund is applicable first to interest, if not directly decided, is conclusively inferable from a decree of the Supreme Court of Pennsylvania in Rae v. Pennsylvania Canal Company, 245 Pa. 589, 91 Atl. 1053, in which that court had occasion to construe other provisions of this mortgage. The case of Rae v. Pennsylvania Canal Company was brought by the trustee of the mortgage on a bill of foreclosure, praying execution of the mortgage and instructions as to the distribution of moneys then in his hands arising from the sales previously made and of moneys to arise from the sale of the remaining property under the decree of foreclosure asked for. The court decided (against the contention of bondholders) that the funds arising and to arise from sales of the mortgaged properties were applicable first to interest, evidently basing its decision upon the perfectly plain terms of the mortgage, that, in the proceeds of such sales, interest is preferred to principal.

Counsel for the railroad company now insistently urge that this construction of mortgage provisions, which in terms prefer interest to principal, indicates the intention of the whole mortgage instrument always to prefer interest to principal, and that the allowance of interest over principal in the two funds before the Supreme Court of Pennsylvania was in effect an adjudication by that court that interest is first to be paid from any fund belonging to the mortgagor howsoever arising. This, of course, includes the sinking fund.

We do not so regard this decision. As we read it, we find that the court had before it two questions and that it decided two things. The questions were the relative priority of interest and principal in two funds raised by the sale of land, and the legal effect of the contract of the railroad company to purchase coupons. The court decided first, that interest has priority to principal in funds arising from property sales already made and yet to be made; and, second, that the contract of the railroad company was one of purchase and not one of guaranty, and that coupons purchased by the railroad company, like coupons otherwise acquired, were payable out of funds in which interest is preferred to principal. The sinking fund provision of the mortgage was manifestly not within the purview of the court's decision, for, at the time of the decision, there was no sinking fund in existence, and there was no occasion either requiring or justifying the court to construe the sinking fund provision. We have followed very carefully the discussion of counsel on this point, but we are satisfied that the decision of the Supreme Court of Pennsylvania in Rae v. Pennsylvania Canal Company did not embrace directly or indirectly a construction of the sinking fund provision of the mortgage, and that in consequence we are not bound by its decision in construing that provision.

The general scheme of the mortgage, considered with respect both to its terms and purpose, contemplates keeping separate the principal and interest obligations and likewise keeping separate their respective securities. This separation rests upon the very practical consideration of the right of the mortgagor to withdraw the securities from the pledge of the mortgage at any time and permit them to be sold free of its lien, and upon the corresponding necessity of substituting in lieu of the securities so to be withdrawn some other security for payment. The initial security for both interest and principal was of course the canal properties, but as the mortgage authorized their entire alienation free from the mortgage pledge, some other security had to be provided. This was done, first for interest and then for principal.

The security substituted or added for the payment of interest was the obligation of the railroad company to purchase coupons, and the security substituted or added for the payment of principal was the sinking fund. As the properties were gradually taken, these remained. These provisions for the payment respectively of interest and principal were kept separate not only for the reason that separate securities were provided for their payment, but because the two obligations

were substantially different in size, and also because for one there was but one obligor while for the other there were really two obligors.

Upon default in interest at the beginning of the mortgage there would be a possible accumulation of interest coupons of $7,200,000, which the railroad company under its obligation was required to purchase. Whether this was a wise arrangement either for the railroad company or for the bondholders is not a matter of present concern. The fact is the arrangement of double obligation with respect to interest was made, and a preference was granted to interest in certain securities. Thus, payment of interest was provided for and secured.

The mortgage then made provision for a sinking fund. A sinking fund in its ordinary meaning is a fund created for extinguishing or paying a funded debt. Of course, interest is a part of such a debt. When both interest and principal are intended to be paid by a sinking fund, the sinking fund appropriations are so calculated, that, their aggregate, together with interest accumulations, shall be sufficient at the maturity of the obligation to pay both. But a sinking fund may provide for the payment of either principal or interest, and not for the payment of both. When interest or principal alone is intended to be discharged by a sinking fund, the appropriations are correspondingly less and are apportioned to the amount intended to be raised at maturity.

The sinking fund provision of this mortgage provided for annual appropriations, the aggregate of which at compound interest would just pay at maturity the $3,000,000 principal of the bonds issued. Such annual appropriations with interest accumulations would not approach a sum sufficient to pay both principal and interest of the bonds, for the principal of the bonds was $3,000,000 and interest upon an early default might conceivably be $7,200,000 (and actually was between $3,000,000 and $4,000,000). It thus appears from the figures of the sinking fund provision that the ultimate fund was intended to be sufficient only to pay principal and was not intended to be sufficient to pay interest in addition. This alone is persuasive of a construction that the sinking fund was provided for the payment of the principal. But the sinking fund provision shows by its own terms the purpose for which it was provided.

Without pursuing the discussion further, it is sufficient to say, that we are of opinion the sinking fund provision was written into the mortgage for the purpose which its own terms indicate, namely, to "provide * * * a sinking fund * * * for the payment of the principal of the bonds"; that the provision for the payment of principal is separate and distinct from provisions for the payment of interest, and that the terms of the sinking fund provision are in no way varied or affected by such other provisions. We, therefore, construe the provision according to its literal terms and hold with the trial court that the sinking fund is applicable first to the payment of the principal of the bonds.

The remaining questions to be considered on the appeal of the railroad company are (1) whether the fees that have been charged against the fund are too large; and (2) whether the railroad company should

be charged with any portion of the fee allowed to the plaintiffs' counsel.

[6] With regard to the fee allowed to the master, we shall only say briefly that we think it exceeds fair compensation. The master's service (rendered and to be rendered) is mainly to be found in a few brief meetings held at intervals during a period of less than three months, and in the preparation of two reports, which, while thorough and careful, could not have been difficult and could not have occupied him more than two months, even if he had done nothing else. In our opinion the first inclination of the learned judge was more nearly in accord with a proper allowance than his final conclusion, and when he comes to consider the master's fee again he should not allow more than half the sum awarded by the decree now under review.

[7, 8] And a similar remark may be made with regard to the fee allowed to the plaintiffs' counsel. Evidently the amount was much influenced by the erroneous theory that the fund recovered in this suit might properly be required to pay for the earlier and unsuccessful litigation that resulted in the decree against the bondholders in the Supreme Court of Pennsylvania, supra. What the bondholders may be willing to pay for these services, is of course their affair: our concern is to see that we do not compel the fund before us to bear a burden that should not be charged against it. We think, not more than half the sum awarded to counsel should be deducted from the fund; and we add that no portion of this sum should be charged against the bonds held by the railroad company. From the first step to the last in both branches of this litigation the railroad company has been the only real defendant, and the bondholders' proceedings have always been adverse. The services for which the bondholders are being asked to pay were rendered not in behalf of the railroad company, but in hostility to its interest. To charge the railroad company now with any part of the cost of producing the fund (and especially with any part of the cost of phases of the present litigation which added nothing to the fund and in which the railroad company was successful), violates the well settled principle that counsel fees are not recoverable from the adverse party to the cause. Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157; Hobbs v. McLean, 117 U. S. 581, 6 Sup. Ct. 870, 29 L. Ed. 940; Smith v. Trust Co., 215 Pa. 413, 64 Atl. 591. This principle is controlling here, and not the fact that the railroad company will share in the award as the lawful owner of 384 bonds. It is true that the railroad company occupies the dual position of defendant in the litigation and a holder of bonds, but as defendant it is paying nearly $2,000,-000 to the plaintiffs, and this seems amply to justify the position that its relation as bondholder is incidental and may be disregarded.

It follows, therefore, that the distribution of the fund should be modified, and to that end we reverse the decree in order that a new decree may be made in accordance with this opinion; the allowances to the master and to plaintiffs' counsel should be diminished, the bonds held by the railroad company should be relieved from the obligation of contributing to the fee awarded to counsel, and costs of both appeals should be paid out of the fund.