**MARSHALL TRANSPORT CO. et al. v. UNITED STATES.**

Civil Action No. 2051.

District Court, D. Maryland.

Oct. 18, 1943.

Ritchie, Janney, Ober & Williams and Robert W. Williams, all of Baltimore, Md., John T. Money and Harry S. Elkins, both of Washington, D. C., and George H. Klein, Bigham D. Eblen, and Robert C. Winter, all of Detroit, Mich., for plaintiffs.

Bernard J. Flynn, U. S. Atty., and T. Barton Harrington, Asst. U. S. Atty., both

of Baltimore, Md., and Robert L. Pierce, Atty., Department of Justice, of Washington, D. C., for defendant.

Before SOPER, Circuit Judge, and COLEMAN and CHESNUT, District Judges.

CHESNUT, District Judge.

The plaintiffs in this action seek a temporary restraining order and a temporary injunction to stay the enforcement of and to set aside an order entered by the Interstate Commerce Commission on September 2, 1943, which rejected and dismissed an application of the plaintiffs for authority to consummate a sale of certain motor-vehicle common carrier operating rights and certain motor-vehicles, equipment and facilities to Refiners Transport and Terminal Corporation. The Commission dismissed the application because it was of opinion that it had no jurisdiction to entertain it since the Union Tank Car Company, a New Jersey corporation, the owner of 82.6 per cent. of the outstanding stock of Refiners, was not a party thereto. The bill of complaint also prayed the issuance of a mandatory injunction requiring the Commission to take jurisdiction of the application and to consider it upon its merits. This court was organized to consider the case under the appropriate statutory provisions. See Sec. 17(9) and Sec. 205(g) of the Interstate Commerce Act, 49 U.S.C.A. §§ 17(9), 305 (g); and the provisions for judicial review codified in 28 U.S.C.A. §§ 41, 43–48, 45a and 47a. See also Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147. The Interstate Commerce Commission and certain protesting motor-vehicle carriers have intervened.

The facts, set out at length in the report of the Commission filed April 5, 1943, are not in dispute. Marshall Transport Company, Inc., is incorporated and has its principal place of business in Maryland. The Transport Company holds a certificate of public convenience and necessity as successor in interest to Marshall under the "grandfather" clause, Secs. 206, 207, Interstate Commerce Act, 49 U.S.C.A. §§ 306, 307, so that the corporation is authorized to conduct operations in interstate commerce as a motor-vehicle common carrier of petroleum products in bulk in tank trucks over irregular routes in Maryland, Delaware, Pennsylvania, Virginia and Washington, D. C. All of Transport's outstanding capital stock except two qualifying shares is owned by plaintiff Warren C. Marshall, who is also president of Transport. Transport has title to certain physical property consisting of shop and garage equipment, office furniture and equipment, and material and supplies. However, Marshall personally owns the automotive equipment employed by Transport, which is used by the latter under a leasing arrangement, and also certain real estate at Glen Burnie, Maryland, employed as a terminal by Transport. It was these operating rights and this property, whether owned by Transport or Marshall, which Refiners sought authority to purchase in the instant application. Refiners also has pending before the Commission several other applications for the purchase of petroleum motor carriers operating in the eastern states.

Refiners Transport and Terminal Corporation is incorporated and has an office in Wilmington, Delaware, and operating offices in Detroit, Michigan. It holds a certificate of public convenience and necessity from the Interstate Commerce Commission to operate as a common carrier by motor-vehicle of petroleum and petroleum products in territory in Michigan, Ohio, Indiana, Illinois, Wisconsin, Missouri, Kentucky, Pennsylvania and West Virginia. The organization of Refiners and of Union Tank Car Company are described in the following passage from the report of the Commission:

"Refiners' Organization

"Refiners is the result of a consolidation of the properties of an intrastate motor carrier and a motor carrier operating in interstate and intrastate commerce as more particularly described in Refiners Transport & Term. Corp.—Stock, 36 M.C.C. 789, transfer of the interstate operating rights involved having been approved under Section 212(b) in the proceedings shown in footnote 3. (These rights were acquired from its predecessor, Petroleum Transit Corporation, pursuant to authority granted in Nos. MC-FC 14544 and MC-FC 14544-A on February 24, 1941.) It controls, through ownership of capital stock, Petroleum Haulers, Inc., an Indiana corporation engaged solely in intrastate transportation by motor vehicle in Ohio and in Indiana, and Union Transport Corporation, a non-operating company. Refiners, in turn, is controlled through ownership of 82.6 per cent. of its outstanding common capital stock, par value $10 per share, by Union Tank Car Company, herein called Union, whose

outstanding capital stock consisting of 1,-080,298 shares as of October 13, 1942, is distributed among approximately 5,000 shareholders. Approximately 33.4 per cent. of such outstanding capital stock is owned by 10 stockholders, the largest block (approximately 22 per cent. of the total outstanding) being held by the Rockefeller Foundation, New York, N. Y. No stock is owned by a rail or water carrier and only 100 shares thereof are owned by a motor carrier. (Motor Express, Inc.) It has no stock interest in any other carrier. It is one of the larger owners of rail tank cars and is engaged in the business of leasing such equipment to shippers under standard car service agreements providing for rental payments on a per diem basis, and receives certain allowances (one and one-half or two and one-half cents per mile depending on the type of car) from railroads as provided under the latters' tariff (Agent B. T. Jones, I.C.C. No. 3619), now on file with this Commission. It does not manufacture tank-car equipment commercially but does maintain extensive repair facilities throughout the country to service its own equipment. However, while in transit the railroads make minor repairs on the cars at charges provided for in a Master Car Builders Agreement to which Union is a party. Approximately 98 per cent. of the equipment leased is used by petroleum producers and distributors, but this is changing rapidly due to prevailing war conditions. It has seven officers, who are also its directors, only one, B. C. Graves, being also one of the five directors of Refiners. He is not an officer of the latter. With the above exception, none of its directors has an interest in any other carrier either as an officer, director, or through stock ownership, and it is against the policy of the company for its directors to hold offices in other companies. Between 70 and 75 per cent. of its outstanding stock is usually voted under proxies held by its president and two vice-presidents."

For complete details of the corporate organization and history of Refiners see the report on this corporation's application to the Commission for authority to issue additional stock found in 36 M.C.C. 789.

On July 8, 1942, an agreement of sale was executed between Transport and Marshall, as vendors, and Refiners, as purchaser, whereby Refiners purchased for the sum of $142,000 the operating rights and properties of Transport and certain equipment and terminal facilities of Marshall in Pennsylvania used by Transport in its operations. Shortly thereafter Transport took title to 10 tractors and 10 trailers with tires included in the purchase for $36,500, the remainder of the purchase price to be subject to certain adjustments and to be paid upon the approval and consummation of the sale. On July 18, 1942, Refiners purchased other equipment of Marshall for the sum of $6,000.

Application to the Commission for authority to consummate the purchase was duly made by the parties to the contract and Refiners has since operated the property, first under temporary authority granted by the Commission under Sec. 210a (b) of the Act, 49 U.S.C.A. § 310a (b), and subsequently under a temporary lease expiring October 17, 1943, executed with the authority of the Commission purporting to be based upon the provisions of Sec. 5(2) (a) of the Act, 49 U.S.C.A. § 5(2) (a). The application came up for hearing before Division 4 of the Commission upon a favorable report of an examiner of the Commission and exceptions thereto filed by certain protesting carriers and by the Anti-Trust Division of the Department of Justice which had appeared at the examiner's hearing. Authority to consummate the purchase was granted by the Division in accordance with its report filed on April 5, 1943, one Commissioner dissenting. Subsequently the matter came up for rehearing before the whole Commission which held in a report filed August 3, 1943, two Commissioners dissenting, that the application could not be lawfully approved because Union Tank Car Company, the owner of 82.6 per cent. of Refiners' outstanding stock, was not joined as an applicant therein. The Commission stated that it would dismiss the application but would defer its order for twenty days in order that Union might have an opportunity to file an application. Union did not avail itself of this opportunity and accordingly the Commission on September 2, 1943, issued its order, effective October 17, 1943, dismissing the application. The present case was instituted to set aside this order and require the Commission to consider the application on its merits.

■ The case turns upon the construction to be given to Sec. 5(2) (a) (i) of the Act, which is as follows:

"§ 5(2) (a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) (i) for two or more carriers to consolidate or

merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise; * * *."

The pertinent clauses in this section of the statute are those which make it "lawful, with the approval and authorization of the Commission * * * for any carrier * * * to purchase * * * the properties * * * of another"; or, "for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise."

Section 5(2) (b) provides that whenever a transaction is proposed under Sec. 5(2) (a) the carrier or person seeking authority therefor shall present an application to the Commission which shall afford a reasonable opportunity for interested parties to be heard, and if the Commission finds that the transaction is consistent with the public interest, it shall enter an order approving the transaction upon terms and conditions which it shall find to be just and reasonable.

Other references in the statute to the control of one person, or corporation by another, which should be considered in determining the meaning of the word "control" in Sec. 5(2) (a) are found in Sec. 1 (3) (b) and Sec. 5(4) as follows:

"§ 1(3) (b). For the purposes of Sections 5, 12(1), 20, 204(a) (7), 210, 220, 304 (b), 310 and 313, of this Act, where reference is made to control (in referring to a relationship between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a

holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control."

"§ 5(4). It shall be unlawful for any person, except as provided in paragraph (2), to enter into any transaction within the scope of subparagraph (a) thereof, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provisions. As used in this paragraph and paragraph (5), the words, 'control or management' shall be construed to include the power to exercise control or management."

The essential controversy is whether the statute is satisfied by securing the approval and authority of the Commission to consummate the sale upon the joint application of Transport and Refiners, or whether Union, as the owner of the majority of Refiners' stock, must also be joined in the application. The significance of the decision resides in the requirements of Sec. 5(3) of the Act which subjects to the jurisdiction of the Commission any person, other than a carrier, who acquires control of a carrier with the approval of the Commission. Section 5(3) is as follows:

"5(3). Whenever a person which is not a carrier is authorized, by an order entered under paragraph (2), to acquire control of any carrier or of two or more carriers, such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier subject to such of the following provisions as are applicable to any carrier involved in such acquisition of control: Section 20(1) to (10), inclusive, of this part, Sections 204(a) (1) and (2) and 220 of part II, and section 313 of part III (which relate to reports, accounts, and so forth, of carriers), and section 20a(2) to (11), inclusive, of this part, and section 214 of part II (which relate to issues of securities and assumptions of liability of carriers), including in each case the penalties applicable in the case of violations of

such provisions. In the application of such provisions of section 20a of this part and of section 214 of part II, in the case of any such person, the Commission shall authorize the issue or assumption applied for only if it finds that such issue or assumption is consistent with the proper performance of its service to the public by each carrier which is under the control of such person, that it will not impair the ability of any such carrier to perform such service, and that it is otherwise consistent with the public interest."

It is important to appreciate the precise, and limited, point that we are called upon to decide. Division 4 of the Commission after hearing the evidence and argument by counsel for the applicants and protestants, considered both the merits of the case and the applicable law. It found the application was made by proper parties under the statute, that the transaction was reasonable and would be in the public interest and it thereupon ordered that the application be approved, subject to certain conditions not here material. Thereafter on application by the protestants the full Commission reconsidered the case, did not pass upon the merits, but dismissed the application on the ground that the majority stockholder of Refiners, the purchasing carrier, was not a party to the application. The final conclusion of the Commission was thus expressed:

"We find and conclude that the instant application may not lawfully be approved in the absence of an appropriate application by the real party in interest, the controlling corporation, Union. The application should be dismissed. Entry of an order dismissing the application will be deferred for a period of 20 days from the date of service of this report in order to afford an opportunity for Union to file an appropriate application. In view of this conclusion further discussion of other contentions now of record is unnecessary."

The conclusion thus reached was not based upon the nature or particularities of Union in the field of transportation or otherwise, but solely on the ground that the Union was a corporation which owned a majority of the capital stock of Refiners, the purchasing motor carrier. The rationale of the Commission's decision is equally applicable to any person or corporation, not a carrier, which owns or controls a majority of the stock of a carrier corporation. And the necessary result therefore is that the Commission lacks authority—power or jurisdiction—to grant any application by one motor carrier for the purchase of the property and operating rights of another motor carrier, unless the majority stockholder of the purchasing carrier formally joins in the application. In reaching this conclusion the Commission departed from its long consistent prior practice to the contrary. As was said by Commissioner Porter in his dissenting opinion:

"Thus for more than seven years we have decided hundreds of applications like the instant one without the majority stockholder of purchaser being a party applicant; but suddenly the majority penalizes this particular purchaser for following the procedure which we ourselves long since established."

We think the conclusion reached by the Commission is not in accord with the intention of the statute to be gathered not only from what seems to us its plain wording, but also from its historical development.

The application in the instant case falls precisely within the permissive phrase of Section 5(2)(a) that it shall be lawful with approval and authorization of the Commission "for any carrier * * * to purchase * * * the properties, or any part thereof, of another". The construction of the statute by the Commission excludes the force and effect of this express authority to the Commission on the ground that it is superseded in the instant case by a subsequent permissive authority given to the Commission "for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise." That is to say, the construction of Section 5(2)(a) by the Commission takes away the authority of the Commission to even consider any application by one motor carrier for the property of another whenever the purchasing carrier has a majority stockholder, unless the latter is a party applicant.

The grammatical structure and wording of Section 5(2)(a) very clearly shows that authority was given to the Commission to consider and act upon applications made by (a) a carrier or carriers and (b) a non-carrier in different types of cases and that the Commission was given such authority to act in any one of the several enumerated situations. Thus, if an applicant or applicants are carriers the Commission is

given authority to (1) permit them to consolidate or merge their properties or franchises; (2) to purchase, lease or contract to operate the properties of another carrier or (3) to acquire control of another carrier through stock ownership or otherwise. And if the applicant is not a carrier, it may, with the permission of the Commission, acquire control of *two or more carriers* through stock ownership or otherwise; and if the applicant has control of only one carrier, it may likewise acquire control of another carrier through stock ownership or otherwise. These several situations in which the Commission is given authority to act are clearly made separate and independent in the statute; but the construction adopted by the Commission has the effect of making the permitted situations in which a carrier or carriers may apply to the Commission alone, dependent upon the last enumerated situation in which a non-carrier, having stock control or otherwise of one carrier, seeks to acquire control of another. The result can only be reached on the theory that the last named permissive situation in which the Commission has authority to act eliminates or supersedes the former situation in which the Commission is expressly given the authority to act. This is not the natural construction of the wording of the section; and it is obvious that it is a construction that is not readily apparent, as the consistent practice of the Commission in similar cases for many years has been to the contrary. We think the proper meaning is that the Commission has authority to act in any one of the several permissive situations irrespective of the others. It is suggested that Sec. 5(2) (a), while permissive in form is in substance made restrictive by the wording of Sec. 5(4), but this view is untenable as Sec. 5(4), making certain transactions unlawful, expressly excepts those authorized by Sec. 5(2) (a).

The view of the Commission that the "non carrier control clause" is restrictive of its authority to act on the "carrier purchase" clause of Sec. 5(2) (a) is clearly contrary to the intention of the statute as seen in its historical development.

As is well known, the original authority of the Interstate Commerce Commission over carriers was contained in the Interstate Commerce Act of February 4, 1887, c. 104, 24 Stat. 380, 49 U.S.C.A. § 1 et seq. The public policy which was at least implicit in this statute (and was expressed in the Sherman Anti-Trust Act of 1890, 15 U.S.C.A. §§ 1–7, 15 note, in a broader field) was that competition was desirable, and that carriers should be independently operated for the public benefit. Accordingly, although the original Act of 1887 was frequently amended in detail in subsequent years, the Commission was not itself given authority to permit consolidations, mergers or other combinations of rail carriers, until the passage of the Transportation Act of February 28, 1920, c. 91, § 407, 41 Stat. 480, 49 U.S.C.A. § 5(1–8). Roberts, Fed. Liability of Carriers (1929), Vol. I, §§ 92, 93. In the meantime, however, general economic experience, emphasized by the lessons learned from the government operation of railroads during World War I, showed that there could well be in particular situations public benefit in economies and facilities of operation by mergers or combinations of rail carriers. Thus there was written into the Transportation Act of 1920, § 5(2), authority to the Commission to permit one carrier to acquire control of another carrier or carriers "either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system," if found to be in the public interest. And indeed by section 5(4) the Commission was directed as soon as practicable to prepare and adopt a plan for consolidation of the railway properties of the Continental United States into a limited number of systems. This proved a very difficult problem for the Commission and nothing had successfully been done thereunder up to the passage of The Emergency Railroad Transportation Act of June 16, 1933, c. 91, 48 Stat. 217, 220, 49 U.S.C.A. §§ 5, 5a, 15a, 15b, 19a. But for several years prior thereto Congress had given consideration to the subject of the public policy involved in the control of two or more carriers through the medium of a "holding company." A prototype of this latter corporate device as affecting rail carriers had years before been considered by the Supreme Court in the Northern Securities case, Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679, and had been condemned as in violation of the Anti-Trust Act. The study by Congress of the effect of the holding company in this relation resulted in the re-writing of Section 5 of the Interstate Commerce Act by the Emergency Railroad Transportation Act, and then there appeared for the first time, among the permissive clauses giving

authority to the Commission to act, the categories with respect to persons or corporations *not carriers* acquiring control of two or more carriers through stock ownership. See Sharfman, The I. C. C., Vol. III A, pp. 495–501 (1935). As then phrased the permissive clause related only to control through ownership of stock. When Congress brought motor carriers under the control of the Commission (Aug. 9, 1935, c. 498, 49 Stat. 543) it gave in very similar language in section 213 authority to the Commission to permit combinations of those carriers. Finally, by the Transportation Act of 1940 (Sept. 18, 1940, c. 722, 54 Stat. 905, 49 U.S.C.A. § 1 et seq., 901 et seq.) water carriers were also subjected to the authority of the Commission; and the whole Interstate Commerce Act was rewritten into three parts, Part I, dealing with rail carriers, Part 2, with motor carriers, and Part 3, with water carriers. Section 5 of the Act was rewritten to comprehensively include all three types of carriers (and an express company) in one provision regarding unifications, mergers and acquisition of control. See 49 U.S.C.A. § 5(13). At the same time there was also added in section 5(2) (a) the words "or otherwise" in the clause with regard to a non-carrier acquiring stock control over two or more carriers.

From this history of the legislation we see that there has been a gradual *extension* of the authority of the Commission to permit mergers and consolidations of carriers subject to its regulation. Prior to 1920 the Commission had no such authority, and the Supreme Court had held in the Northern Securities Case that indirect unified control of two otherwise competitive rail carriers through the means of a separate holding company was prohibited by the Anti-Trust Act. To meet this condition, in part at least, and thus obtain the public benefit of unified control in particular situations, Congress provided in the Transportation Act of 1920, that the Commission should have authority to permit a rail carrier or carriers to acquire control of another by a lease, or purchase of stock or otherwise not involving actual consolidation; and by section 5(8) the carriers affected by the order of the Commission were to be relieved from the operation of the "anti-trust laws." And by section 5(6) the Commission was also authorized, upon special conditions, to approve the actual consolidation of rail carriers. So far the Commission had no authority to permit the unified control of *two*

separate carriers by the holding company device, which was still subject to the anti-trust laws. But in 1933 Congress further broadened the authority of the Commission by permitting approval of this condition when found in the public interest. It thus appears that the non-carrier control clause of the 1933 statute was intended to apply to a holding company control of two or more carriers, which is a quite different condition from the one involved in the instant application.

No further change was made in the phraseology of section 5(2) (a) until the Transportation Act of 1940 added the phrase "or otherwise" as previously noted. It appears from the Commission's opinion in this case that the chief reliance for the present construction of the Act is placed on the addition of this phrase. Indeed counsel for the United States and the Interstate Commerce Commission at the argument in this court conceded that their position was untenable save for the change said to have been effected by the addition of this phrase "or otherwise." But we think it clear that the addition of this phrase had no such effect. It expanded and did not restrict the scope of action and authority of the Commission. That this was the intended effect is expressly stated in the only legislative history of the change which has been called to our attention. In House Conference Report, No. 2832, Aug. 7, 1940, p. 68, it was said:

"1. Paragraph (2) is changed by adding the words 'or otherwise' in several places, so that acquisition of control by methods other than true ownership of stock *is authorized with Commission approval.*" (Italics supplied.)

In the Congressional Record for the Senate on September 9, 1940, pp. 17848 to 17851, there is contained a statement by Senator Wheeler giving some explanation of certain provisions of the Transportation Act which, in discussing the new Section 5 contains no intimation that there was any intention to effect the change in the statute now read into it by the Commission. What Senator Wheeler there said was: "The principal change in existing law on consolidations is the repeal of the provision requiring the Commission to prepare and adopt a general consolidation plan. Section 213 of the Motor Carrier Act, which related to unifications of motor carriers, is repealed, and the law governing all mergers or consolidations of carriers covered by the

Act is amended by section 5 of the Interstate Commerce Act."

The basic misconception of the Statute found in the Commission's present construction is in treating the non-carrier control clause of section 5(2) (a) as restrictive or prohibitive when the history of the enactment shows clearly that it was not intended to be restrictive but permissive. In this respect the effect of the Commission's present position is to reverse the consistent progressive congressional policy in broadening the authority of the Commission to deal with various types of cases involving control of two or more carriers. This misconception seems to be due to a confusion between the permissive clause of section 5 (2) (a) and the prohibitive clauses of section 5(4), (5) and (6). Until 1933 non-carrier control of two or more carriers was prohibited, not by the Interstate Commerce Act, but by the Anti-Trust Act. See the discussion in Sharfman, supra, Vol. III A, p. 435 et seq. When in 1933 Congress extended the authority of the Commission to permit non-carrier control of two or more carriers through stock ownership (that is a holding company) it also for the first time in the Interstate Commerce Act was at pains to expressly prohibit unified control of two or more carriers in any other way than those permitted in section 5(2) (a). The effect of these sections taken together was that the Commission had authority to permit unified control by a non-carrier holding company, but not by other types of non-carrier control. The 1940 Act by adding the phrase "or otherwise" to the clause further extended the authority of the Commission in this respect.

The construction of the statute now adopted by the Commission is not necessary to the public interest in the regulation of carriers. When a non-carrier acquires control of two separate carriers (without Commission approval) there exists the possibility of disadvantage to the public interest in that one carrier may be managed in the interest of another carrier [see section 5(6)]. To prevent this it is made unlawful for the non-carrier to acquire such control without the Commission's approval, which is to be obtained only upon an application to the Commission by the non-carrier which may then be subjected to such conditions as may be thought necessary by the Commission in the public interest to the extent authorized by sec. 5(3). Without discussing such permissible conditions in detail it is sufficient

to say that their general purpose is to preserve the integrity and efficiency of the separate carriers to the extent necessary for the public interest. Without such Commission control over the non-carrier, the Commission would have no authority to restrain its possible prejudicial activities. But when the application is made directly by one or more carriers to the Commission, the latter has full and complete authority over them by the statute to the extent of the public interests involved. In the instant case where the carrier is directly applying to the Commission to purchase the property and franchises of another motor carrier which will then cease to function as a carrier, it seems quite impossible to infer that there could be public disadvantage by reason of lack of authority of the Commission to fully deal with the matter on the merits.

In dismissing the application in this case the Commission referred to Union, the majority stockholder of Refiners, as the "real party in interest." We understand this to mean no more than that the Commission felt it had no authority to consider the application by reason of its construction of the statute. But it is proper to say that in our opinion the application in this case was in fact made by the real party in interest within the statutory intent. It is a common concept of corporation law that there is a distinct difference between a corporation and its stockholders. Pullman's Palace-Car Co. v. Missouri Pac. R. Co., 115 U.S. 587, 597, 6 S.Ct. 194, 29 L.Ed. 499; Hazeltine Corp. v. General Elec. Co., D.C., 19 F. Supp. 898, 900. On the mere question of the jurisdiction of the Commission under the statute, there is no occasion in this case to go behind the direct action of the corporation itself. Our attention has not been called to any evidence in this record that the application by Refiners was anything other than due corporate action. The fact that its majority stockholder may have also approved it is immaterial. If at the hearing on the merits the Commission finds there are special reasons affecting the public interest growing out of the particular situation of Union in the field of transportation, that is a matter which the Commission can, of course, properly consider on the merits. We have no occasion to consider it here. It is not denied that on merits the Commission has ample authority to inspect the books and records of Union so far as relevant to the case. See 49 U.S. C.A. § 320(d). On the other hand the con-

struction adopted will tend to the public disadvantage in discouraging applications for carrier consolidation which may really be in the public interest.

Some of the discussion in the opinion of the Commission seems to confuse the question of the authority of the Commission with the merits of the particular application. Thus it is said that Union, as majority stockholder of Refiners, might furnish additional capital for the purchase of properties of other motor carriers and thus through its subsidiary (Refiners) expand indefinitely in the field of motor transportation. But the complete answer to this suggestion is that no purchase proposed directly by Refiners, even though stimulated by its majority stockholder, could be made effective without the approval of the Commission on the merits. In holding that the Commission has the authority under the statute to consider the application in the instant case, we do not intimate or imply any opinion whatever with regard to whether the Commission should approve the application on the merits. Indeed as appears from the Commission's report and the record of the case, numerous other objections on the merits have been interposed to the approval by the Commission. We have no occasion to consider them. All we hold is that on the proper construction of the statute the Commission has authority to consider the application. At the hearing here inquiry was made from the Bench as to whether counsel for the defendants interpreted the order of the Commission as amounting to a dismissal on the merits or only on the jurisdictional ground. The response of counsel for the Interstate Commerce Commission was that the latter was the only possible interpretation of the Commission's opinion and order, and so it seems to us.

The principal argument advanced by counsel for the defendants in support of the Commission's order is that, when Refiners buys the property of Transport, Union, as the majority stockholder of Refiners, will thus acquire control of Transport and therefore the case falls within the non-carrier control clause of 5(2) (a). It is correctly said that if Union had itself acquired stock control of Transport, the transaction would be directly within the non-carrier control clause; and it is argued that a purchase of the property and franchises of Transport by Refiners is likewise an acquisition of control by Union. Attention is also called to the broad definition of control contained in the statute and to

the legislative intention that it is to be interpreted in the light of the decision of the Supreme Court in Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (see Cfce. Report, supra, p. 635).

For the reasons heretofore indicated we think this argument, so far as it is sound, goes to the merits of the particular application rather than to the authority of the Commission to consider it. We are in accord with the view that the word "control" should have the broad construction indicated, but as we find the non-carrier control clause is not restrictive of the carrier purchase clause, and is therefore not applicable to the instant situation, it is unnecessary to the decision here to determine the full extent of the word "control." But it is not inappropriate in this connection to point out that the breadth of construction must necessarily be limited by the main purpose of the statute, which was to prevent unfair domination and management of one carrier for the advantage of another. Such a condition can exist only where there are two going carriers. In the instant case if the application of the carriers is granted by the Commission there will result but one carrier, a majority of whose stock will be owned by Union. We do not think it was the intention of the statute to make the non-carrier control clause applicable to such a situation, at least with respect to the authority of the Commission to consider the application. If the particular relationship of Union in the whole situation is deemed material by the Commission, that can be fully considered by it on the merits of the case.

At the hearing of this case it was agreed that the matter should be submitted for final order or decree as well as upon the application for preliminary injunction. We conclude that the complainants are entitled to a final order to the effect that the Commission has authority to hear the application of Refiners and Transport on the merits without the formal joinder of Union in the application.

Counsel may submit the appropriate judgment in due course.

COLEMAN, District Judge, concurs.

SOPER, Circuit Judge (dissenting).

It is true, as pointed out in the court's resume of the relevant history of the statute under consideration, that Congress has

recognized the economic desirability or necessity of the merger or combination of carriers in the various fields within the jurisdiction of the Interstate Commerce Commission. Through the years there has been a gradual extension of the Commission's authority to permit carrier mergers and consolidations. Equally clear, however, has been the purpose of Congress to subject these natural monopolies to regulation, and each extension of the Commission's power to permit consolidation has involved also the extension of its power and duty to secure and exercise regulatory control.

It is from this viewpoint that we must answer the question whether Union, a non-carrier which already controls through stock ownership one motor carrier, to wit, Refiners, may secure control of another carrier, that is, Transport, by causing Refiners to purchase and operate Transport's property and privileges, and may do this without subjecting itself to the Commission's authority. It is conceded that if the transaction were to be consummated through the acquisition by Union of stock control of Transport, Union would be required by the statute to make application to the Commission.

But, it is said that if Union secures substantially the same extension of its influence in the carrier field through the instrumentality of Refiners, its subsidiary, Union, may lawfully remain free from the Commission's control; or, in other words, that without subjecting itself to the Commission's control Union may extend its operations in the motor carrier field indefinitely provided only that it does not act directly as the purchaser of the property or the controlling stock interest of another carrier but secures the property or stock control thereof through the medium of its subsidiary.

This conclusion is reached very largely by centering attention upon the terms of Section 5(2) (a) of the statute which inter alia authorize the Commission to approve, either the purchase by one carrier of the properties of another, or the acquisition by a non-carrier, which has control of a carrier, of another carrier through ownership of its stock or otherwise. Since the application of Refiners to the Commission for the approval of its purchase of Transport satisfies the first alternative, it is said that it is not necessary for Union to comply with the second alternative by joining in

the application. It happens in this instance that the same transaction will accomplish both alternatives, for not only will Refiners thereby acquire the property of Transport, but Union will secure control of Transport, if a liberal rather than a strict interpretation is given to the term. It does not seem reasonable to believe that Congress intended to exempt from the Commission's control the dominant actor in such a situation; and this becomes more clear when the provisions of Section 5(4) are given effect. Therein it is made unlawful for any person to accomplish the control in common interest of two or more carriers in any manner whatsoever except as provided in Section 5(2). Paragraph (a) thereof requires the approval of the Commission to the transaction; and paragraph (b) thereof requires a person seeking authority to engage in such a transaction to present an application to the Commission and gives the Commission power to approve it, if it finds that it is within the scope of paragraph (a) and will be consistent with the public interest. It seems obvious, therefore, that it will be unlawful for Union to enter into the proposed transaction unless it applies for and receives the Commission's approval; and it becomes the duty of the Commission to refuse to consider the proposed transaction unless Union joins in the application, for otherwise the Commission's approval will countenance the participation of Union in the formation and management of the proposed consolidation contrary to the terms of the statute.

We are told that this construction of the statute involves the basic misconception that Section 5(2) (a) is restrictive of the Commission's power when history shows that the section was intended to be permissive. This conclusion also is reached by centering attention upon this sub-section without sufficient consideration of the other statutory provisions. The fact is that the Commission's interpretation actually augments its power and authority. If its view is adopted neither the holding company nor the subsidiary may proceed without its approval. Moreover, if, as in this case, the interested person is not a carrier, and if he is authorized to acquire control of a carrier, he must thereafter, to the extent provided by the Commission, be considered a carrier and subject to certain carrier provisions which are enumerated in Section 5(3) of the statute. Clearly the Commission's interpretation confers upon

it a control of all the persons involved which is co-extensive with the merger or consolidation that is to be effected; and nothing else would effectuate the salutary purpose of Congress to permit consolidations of carriers that are economically desirable and at the same time to subject them to the authority of its appointed agent.

This interpretation of the statute depends upon the breadth to be given the term "control," as used in Section 5(2) (a) of the Transportation Act of September 18, 1940, under which the Commission now operates. Fortunately the legislative history clearly indicates the meaning which Congress had in mind. The conference report on the Transportation Act of 1940, H.R. 2832, 76th Congress, 3rd Sess., p. 63, contains the following passage:

"Section 2(b). Definition of Control.

"This subsection inserts in paragraph (3) of Section 1 of the Interstate Commerce Act a definition of 'control' which will apply in certain specified sections of the Act where that term is used in referring to a relationship between any person or persons and another person or persons. Since the term 'person' is defined to include artificial as well as natural persons, the definition of control will cover relationships between corporations, companies, associations, etc.

"The definition of control was made to apply only in the specified sections because it was thought undesirable to make any change in the interpretation of present law in certain other provisions of the Act, notably Section 1(1)-(a) and Section 15 (4). The application of this definition of control will in most cases be in connection with the use in the sections to which it applies of the phrase 'controlling, controlled by, or under common control with' a carrier. This phrase has been used because it has recently had the benefit of interpretation by the Supreme Court in the case of Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147, decided April 17, 1939."

Section 1(3) (b) of the Act of 1940 heretofore quoted in the opinion of the court provides that control, as used in Section 5 and other sections, shall be construed to include actual as well as legal control whether exercised through circumstances surrounding organization or operation, through common directors, officers or stockholders, voting trusts, holding companies, "or through or by any other direct or indirect means." This language was used because, as the conference report shows, language of like breadth in Section 2 of the Communications Act of 1934, 48 Stat. 1064, 47 U.S.C.A. § 152(b), had been recently interpreted by the Supreme Court in Rochester Telephone Corp. v. United States, 307 U.S. 125, 145, 59 S.Ct. 754, 764, 83 L.Ed. 1147, where the court said:

"The record amply justified the Communications Commission in making such findings. Investing the Commission with the duty of ascertaining 'control' of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case. So long as there is warrant in the record for the judgment of the expert body it must stand. The suggestion that the refusal to regard the New York ownership of only one third of the common stock of the Rochester as conclusive of the former's lack of control of the latter should invalidate the Commission's finding, disregards actualities in such intercorporate relations. Having found that the record permitted the Commission to draw the conclusion that it did, a court travels beyond its province to express concurrence therewith as an original question. 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body'."

The opinion of the Supreme Court also referred to House Report 1850, 73rd Congress, 2nd session 4-5, which considered the proposal to make use of the terms "parent," "subsidiary" and "affiliated" in respect to the corporate relations of common carriers in the Communication Act of 1934. The report contained the following passage:

"Many difficulties are involved in attempting to define such terms. It is believed that a more satisfactory result will be reached by referring to such persons as in the Senate bill and the amendment. No attempt is made to define 'control' since it is difficult to do this without limiting the meaning of the term in an unfortunate manner. Where reference is made to control the intention is to include actual control as well as what has been called legally enforceable control. It would be difficult, if not impossible, to enumerate or to anticipate the many ways in which actual control may be exerted. A few examples

of the methods used are stock ownership, leasing, contract, and agency. It is well known that actual control may be exerted through ownership of a small percentage of the voting stock of a corporation, either by the ownership of such stock alone or through such ownership in combination with other factors."

The intent of Congress to include within the purview of Section 5(2) (a) all means by which control of a carrier may be acquired is further shown by contrasting the terms of that section with those of the corresponding section, to wit: Section 213(a), of the Motor Carrier Act of August 9, 1935, 49 Stat. 543, 555. In the earlier statute the acquisition of control which subjected the transaction to regulation by the Commission was such as occurs in corporate consolidation or merger, or in purchase, lease or contract to operate carrier property, or in purchase of the stock of a corporate carrier. When the same subject was treated in Section 5(2) (a) of the latter Act, Congress was careful to add the words "or otherwise" to the description of specific methods by which carrier control might be acquired. Clearly Congress desired to avoid the limitation of control to that acquired through any particular method.

If these guides to the intention of Congress are observed, it seems impossible to give to the statute the literal and narrow construction for which the plaintiffs contend; and the prior reports of Division 4 of the Commission, in which this construction was adopted without contest, lose their significance. Keeping in mind that the test is actual rather than legal control, whether exercised directly or indirectly, it is futile to point out that the pending transaction contemplates the purchase of Marshall's property and its extinction as a corporate carrier. The reality is that Refiners will acquire the property and operating rights of Marshall, and thereupon, through the instrumentality of Refiners, Union will acquire control of another carrier. The same conclusion must be reached, if the purpose of Congress to subject motor carriers to the jurisdiction of the Commission is to be carried out, when Union, through its subsidiary, indirectly accomplishes the same result by the purchase of carrier property or by corporate merger or by other means. Under any other view,

Union could expand its control over the motor carrier field indefinitely without itself submitting to the regulatory power of the Commission.

The pertinence of these observations to the peculiarities of the business of motor transport with which the Commission is familiar is shown by the following passage from its final report:

"There can be no more direct or positive manner of obtaining control than by outright purchase. It is inconceivable that the outright purchase of another company's franchise and properties through the medium of the already owned subsidiary would have been exempted while the mere purchase of stock control of the other company through the same subsidiary would activate the statute. As a matter of fact, acquisition of control of many motor carriers could be obtained only by purchase of the properties because many motor carriers are owned by individuals alone or by partnerships. Such individuals and partnerships often possess extensive operating rights. It further is to be noted that the financial and business structures of many motor carriers are quite simple even when incorporated. Their stock usually is closely held, and they rarely have securities outstanding evidencing long-term debt. Their terminals in many instances are rented; their equipment if not fully paid for is covered by some form of a purchase money contract; their other assets often consist of a relatively small amount of furniture, some spare tires and parts, together with accounts 'receivable' representing outstanding freight bills, etc. Their 'liabilities' often consist principally of unpaid equipment balances, bills for tires, parts, and fuel, etc. It often is quite simple under these circumstances to acquire for cash the 'assets' including certificate and good will, and to assume or pay the 'liabilities', and to liquidate the concern. Proceeding thus through a controlled subsidiary, a non-carrier holding company, or others, may expand at will without becoming subject to our jurisdiction under the construction adopted by the division. We cannot agree to that construction of 'control' as used in the Act."

The decision of the Commission should be sustained and the bill of complaint should be dismissed.